Mrs. Jewell **SCHENEBECK** and Russell
Schenebeck, Appellees,

v.

**STERLING DRUG, INC.,** Appellant.

No. 19576.

United States Court of Appeals,
Eighth Circuit.

April 1, 1970.

Rehearing Denied April 29, 1970.

Alston Jennings, Wright, Lindsey & Jennings, Little Rock, Ark., for appellant and filed briefs.

Henry Woods, McMath, Leatherman, Woods & Youngdahl, Little Rock, Ark., for appellees, C. A. Walls, Jr., Lonoke, Ark., and Thomas C. Hullverson, Hullverson, Richardson & Hullverson, St. Louis, Mo., were with him on the brief.

Before VOGEL, BLACKMUN and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

Plaintiff Jewell Schenebeck sustained blindness from taking the prescription drug Aralen over a five-year period. She and her husband brought an action for damages against the manufacturer, Sterling Drug, Inc. (Sterling). An Arkansas district court jury awarded her $40,000.00, and her husband an additional $10,000.00 for consequential loss, based on defendant's negligence. Following the verdict, Sterling moved for judgment n. o. v. The trial court denied the motion for reasons stated in a mem-orandum opinion reported in 291 F.Supp. 368 (E.D.Ark.1968). Sterling appeals from the judgment and urges two contentions upon us:

(1) Defendant's failure to timely warn that Aralen could produce blindness was of no legal consequence and not a proximate cause of the harm sustained by Mrs. Schenebeck (hereinafter plaintiff), since her attending physician otherwise timely acquired equivalent information concerning the drug from an independent source, and

(2) Plaintiff sustained harm from Aralen prior to December 9, 1963, and her failure to bring action within three years thereafter as required by the applicable Arkansas statute of limitations bars her action.

Arkansas substantive law controls this products liability diversity case. On our review of the record, we hold that the trial court properly submitted the issues in question to the jury.

Aralen constitutes Sterling's brand name for the ethical drug chloroquine phosphate, usually referred to as chloroquine, a synthetic anti-malarial drug that has also proved effective in the treatment of rheumatoid arthritis.

Dr. Ralph Patterson, an internist practicing his specialty in Hot Springs, Arkansas, first prescribed Aralen in 1958 for treatment of Mrs. Schenebeck's chronic rheumatoid arthritis. He initially prescribed the usual does of one 250 milligram tablet to be taken each day. He mailed her a second similar prescription in July of 1962. Both were refillable. He did not personally see her between November, 1961 and May, 1963. The plaintiff took Aralen tablets almost daily until May 7, 1963, when she reported to Dr. Patterson that she had experienced blurring of her vision. Dr. Patterson recommended that she stop taking the drug until she had been checked by a qualified ophthalmologist. Thereafter, Mrs. Schenebeck underwent eye examinations by Dr. Raymond Cook (July 22, 1963) and Dr. John G. Watkins (October 11, 1963), both qualified

ophthalmologists from Little Rock, Arkansas. Neither doctor discovered any pathology in her eyes. She had also earlier been examined by Dr. W. J. Schwarz, also practicing in Little Rock, who reported negative findings from examinations on October 23, 1962, and on March 5, 1963. Mrs. Schenebeck, however, continued to have difficulties with her vision. On November 16, 1963, she wrote to Dr. G. A. Peters of the Mayo Clinic at Rochester, Minnesota, whom she had consulted in 1958 for her arthritic problem, inquiring whether Aralen could cause her eyes to fail. She complained, "They are failing more and more all the time until I am half blind. Eye specialist find no disease, no cause. I stayed off the tablet [Aralen] for 3 months with no change." Dr. Peters referred this letter to another Mayo staff specialist, Dr. John G. Mayne, who wrote in reply:

"If you have been taking Chloroquine (Aralen) constantly over this period it is indeed possible that your visual defect is related to the use of the medication. I would advise that you stop the medication completely until this can be definitely settled. I think you should discuss this with your general doctor and with your eye specialist who can answer this question * *."

Mrs. Schenebeck showed this letter to her attending physician, Dr. Patterson. Dr. Patterson thereafter wrote Dr. Mayne on December 6: "Her vision has not improved and I fear it is permanently impaired. If you have any suggestions concerning her condition, I would appreciate hearing from you." Dr. Mayne responded that he knew of no effective remedy for retinopathy related to antimalarials and he recommended that she take no more of this type of medication. Dr. Patterson then wrote the plaintiff advising that she cease using chloroquine. Mrs. Schenebeck has taken no additional chloroquine-type drugs since receiving Dr. Patterson's letter on December 21, 1963. Though Dr. Patterson and Dr. Mayne suspected that Mrs. Schenebeck suffered from chloroquine retinopathy, no actual pathology was discovered in her eyes until September 2, 1964, when she was again examined by Dr. Watkins. The negative pathology findings of the previous October were replaced with observations of fine clumps of pigment in the macula of both eyes. Her vision, which Dr. Watkins characterized as good the prior October, had deteriorated to a condition he described as "industrial blindness". The patient was again referred to the Mayo Clinic, and Dr. Thomas Kearns on its ophthalmological staff diagnosed her condition as chloroquine retinopathy.

This diagnosis serves as a statement of both disease and medical causation, since the description denotes an abnormal condition of the retina produced by chloroquine.

Sterling's literature on Aralen available generally to the medical profession between 1958 and February of 1963 stressed the relative safety of its use. Among other things, defendant's literature recited that doctors need not concern themselves with "precautions or preventive measures * * * before, during or after the use of * * * Aralen" nor "frequent patient checkups". In the Physicians Desk Reference, a publication generally available to all doctors and utilized by drug companies to inform the medical profession of the characteristics, uses and side effects of drugs, Sterling advertised between 1958 and 1961 (omitting Aralen advertisement in 1962) that Aralen's side effects included "headache, visual disturbances * * *. Often transient, or subsides on withdrawal or reduction of dosage". Sterling's Aralen "product card" distributed to doctors by its detailmen mentioned retinal vascular response in the context of an idiosyncracy.

Information circulated in the scientific and medical community before and during 1961 reported serious ocular side effects in patients utilizing chloroquine therapy. For example, a 1961 American Medical Association publication on drugs called attention to permanent eye damage

incurred by a "few" patients as a result of the use of Aralen.

A medical information letter dated December 21, 1962, published by Drug and Therapeutic Information Inc. of New York City, which analyzed anti-malarial drugs, including chloroquine (Aralen), noted that frequent toxic effects had been reported from the use of such drugs and suggested caution in their dispensation. It advised that ophthalmological examinations which include plotting of the visual fields should be considered mandatory when the drug "is to be given over a period of months". The letter further indicated that usual doses of chloroquine " * * * can be given with reasonable safety for at least a year—longer on an intermittent schedule". Dr. Patterson received and read this latter drug information letter.

Thereafter, in February of 1963, Sterling radically changed its medical literature concerning side effects attributable to chloroquine and by a special letter mailed to almost every doctor in the United States specifically warned of the risk of chloroquine retinopathy and cautioned that prolonged therapy must be accompanied by initial and frequent ophthalmological examinations.

## PROXIMATE CAUSE

Appellant urges that the Drug and Therapeutic Information letter of December 21, 1962, adequately warned Dr. Patterson of the dangers incident to long-term Aralen therapy; that this warning was timely since Mrs. Schenebeck then had reported no ill effects from the use of Aralen and that Dr. Patterson, nevertheless, continued her on Aralen therapy. Appellant concludes that any failure to timely warn played no part in producing the plaintiff's injury.

■ We disagree. We examine the appellant's contentions in the light of the continuous duty cast upon the manufacturer of an ethical drug to warn physicians of the dangers incident to prescribing the drug, to keep abreast of scientific developments touching upon the manufacturer's product and to notify the medical profession of any additional side effects discovered from its use. See generally Basko v. Sterling Drug, Inc., 416 F.2d 417, 426 (2d Cir. 1969); Davis v. Wyeth Laboratories, Inc., 399 F.2d 121, 130 (9th Cir. 1968); O'Hare v. Merck & Co., 381 F.2d 286, 290–291 (8th Cir. 1967); Johnston v. Upjohn Co., 442 S.W.2d 93, 95 (Mo.1969); Krug v. Sterling Drug, Inc., 416 S.W.2d 143 (Mo. 1967). A drug manufacturer's compliance with such rule enables physicians to balance the risk of possible harm against benefits to be derived by their patients' use of such drugs. In considering the alternatives of treatment, the prescribing physician is entitled to make an informed choice.

■ The record in this case, although perhaps not as clear concerning background information on the development, testing, and initial use of the drug as in other reported Aralen products liability cases,[1] established that Sterling ought to have recognized and generally warned the medical profession that permanent eye damage could result from the use of this product in 1961 or, perhaps, even earlier. However, Sterling's literature continued muted until 1963 in acquaint-

1. See Basko v. Sterling Drug, Inc., 416 F. 2d 417 (2d Cir. 1969); Kershaw v. Sterling Drug, Inc., 415 F.2d 1009 (5th Cir. 1969); Sterling Drug, Inc. v. Yarrow, 408 F.2d 978 (8th Cir. 1969); Sterling Drug, Inc. v. Cornish, 370 F.2d 82 (8th Cir. 1966); Bine v. Sterling Drug, Inc., 422 S.W.2d 623 (Mo.1968); Krug v. Sterling Drug, Inc., 416 S.W.2d 143 (Mo. 1967); Oppenheimer v. Sterling Drug, Inc., 7 Ohio App.2d 103, 219 N.E.2d 54 (1964); Cochran v. Brooke, 243 Or. 89, 409 P.2d 904 (1966).

The trial court explained the lack of background information as attributable to defendant's trial tactic in not presenting any evidence concerning this drug from medical and scientific experts and from some of its own personnel who were present in the courtroom. Schenebeck v. Sterling Drug, Inc., 291 F.Supp. 368, 373 (E.D.Ark.1968).

ing the medical profession generally with the hazards of long-term Aralen therapy, the earlier literature affirming that the drug could be prescribed without specific precaution. Thus, Sterling breached its legal duty to the medical profession and vicariously to this plaintiff. It remains for us to consider whether Sterling's failure to warn of Aralen's dangerous attributes prior to February, 1963 proximately caused or contributed to cause Mrs. Schenebeck's injury to her eyesight.

The evidence establishes that the toxic effect which chloroquine produces upon the retina is one of gradual and even delayed onset with later progression. In this case, the deterioration of Mrs. Schenebeck's eyes continued for years after she ceased using the drug. In Dr. Kearns' opinion, the drug's toxic effect was not idiosyncratic, but followed as a concomitant of prolonged use. A timely and effective warning concerning Aralen's dangerous propensities communicated to Dr. Patterson prior to his issuing Mrs. Schenebeck a second refillable prescription for this drug in July of 1962 would have afforded him the opportunity to then change the nature and course of her drug therapy. Thereafter, Dr. Patterson did not see Mrs. Schenebeck until May of 1963, when he directed her to stop using the drug until she had been examined by an eye specialist. After that visit, he did not direct Mrs. Schenebeck to resume Aralen therapy. She assumed she might resume taking the drug after receiving a report from the ophthalmologist that her eyes appeared undamaged. Dr. Patterson still utilizes Aralen therapy in treating his patients afflicted with collagen diseases, including rheumatoid arthritis, but he does so now through "intermittent therapy".

The evidence in this case permits these inferences relating to causation:

(1) Sterling should have warned the medical profession as early as 1961 that prolonged Aralen therapy could produce blindness;

(2) Dr. Patterson would have heeded such warning and altered his course of treatment of Mrs. Schenebeck's arthritis;

(3) Mrs. Schenebeck sustained unnecessary exposure to the toxic effects of Aralen during three years, 1961, 1962 and 1963; and

(4) Such additional exposure probably produced her later irreversible blindness.

Thus, we think the plaintiff presented sufficient evidence for the jury to find that Sterling's failure to timely warn constituted an omission on its part which operated through a natural sequence of events to proximately cause or contribute to plaintiff's harm. See Parke-Davis and Co. v. Stromsodt, 411 F.2d 1390 (8th Cir. 1969).

In Sterling Drug, Inc. v. Cornish, 370 F.2d 82 (8th Cir. 1966), we noted:

"If the doctor is properly warned of the possibility of a side effect in some patients, and is advised of the symptoms normally accompanying the side effect, there is an excellent chance that injury to the patient can be avoided. This is particularly true if the injury takes place slowly, as is the case with the injury in question here." 370 F.2d at 85.

Defendant's reliance on non-drug liability cases such as Allen v. Lake Catherine Footwear Corp., 246 Ark. 234, 437 S.W.2d 803 (1969); United States v. Bowers, 202 F.2d 139 (5th Cir. 1953),[2] holding that a failure to warn is not a proximate cause of the injury where the danger is obvious, has no application to the facts in this case. Whether or not Sterling's failure to warn proximately caused or contributed to Mrs. Schenebeck's blindness was an issue properly submitted to the jury. Sterling Drug, Inc. v. Cornish, 370 F.2d 82 (8th Cir. 1966); Abbott Laboratories v. Lapp, 78 F.2d 170 (7th Cir. 1935).

2. For a later case in similar vein arising under Arkansas Law, see Oliver v. Hallett Construction Co., 421 F.2d 365 (8th Cir., Jan. 28, 1970).

## STATUTE OF LIMITATIONS

Arkansas statutes provide that a plaintiff seeking redress for wrongs to person or property must commence action within three years after his cause "shall accrue". Ark.Stat. §§ 27–901, 37–206 (1962 Replacement).[3] Appellant maintains that under Arkansas law, the statutes of limitations governing tort liabilities commence to run from the time of the negligent or wrongful act—not from the time the damage may be ascertained. Thus, it argues that the effects of its failure to warn (its negligence) terminated in either December of 1962 or February of 1963, when Dr. Patterson received letters warning of possible visual side effects from Aralen therapy. Appellant, thus, concludes that the statute had run its full three-year course prior to December 9, 1966, the date on which plaintiff filed the complaint.

While it is true that the Arkansas Supreme Court has referred to the statute of limitations governing negligence actions as commencing "from the time when the injury was first inflicted * * *", Field v. Gazette Publishing Co., 187 Ark. 253, 59 S.W.2d 19, 20 (1933), and that court has specifically held that a plaintiff who discovered more than three years after an automobile accident that his loss of hearing was traceable to the accident could not recover since the " * * * wrongful act was complete at the moment the car was turned over", Faulkner v. Huie, 205 Ark. 332, 168 S.W.2d 839 (1943), nevertheless, an analysis of the Arkansas cases, we believe, demonstrates that appellant reads them too narrowly. As we construe the Arkansas cases, in the instances where there has been delay between the negligent act and the damage, the occurrence of harm marks the beginning of the period. Thus, in Field v. Gazette Publishing Co., supra, also dealing with a slow-developing disease, the court approved an instruction authorizing the jury to determine whether the statute of limitations had run by determining whether the plaintiff " * * * contracted the malady of which he complains * * * " prior to a specified crucial date. This same test was again mentioned as a dictum in Barksdale v. Silica Products Co., 200 Ark. 32, 137 S.W.2d 901 (1940). Even though defendant has completed a negligent surgical operation, Arkansas has held that the statute need not commence running with the negligent act if discovery of the damage has been delayed. See Burton v. Tribble, 189 Ark. 58, 70 S.W.2d 503 (1934) (patient's malpractice action against surgeon commenced more than three years following surgical procedure to recover for damage attributable to a foreign object left in the body, held not barred).[4] In an action for damage to land subsiding because of loss of subjacent support caused by defendant's earlier negligent act, the Arkansas court has held the cause accrues from the time the damage to the surface becomes apparent rather than when the defendant removed the underground support. Western Coal & Mining Co. v. Randolph, 191 Ark. 1115, 89 S.W.2d 741 (1936). A traditional element of a cause of action in a negligence action requires the invasion of another's interest. See Restatement (Second) of Torts, § 281 (1965); Prosser, The Law of Torts, 146–148 (3d ed.

---

3. "For wrongs done to the person or property of another, an action may be maintained against the wrongdoers, and such action may be brought by the person injured, * * * in the same manner and with like effect in all respects as actions founded on contracts." Ark.Stat. § 27–901 (1962 Replacement).

"The following actions shall be commenced * * * within three [3] years after the cause of action shall accrue:

* * * fourth, all actions (of account, assumpsit, or on the case,) founded on any contract or liability, express or implied; * * * " Ark.Stat. § 37–206 (1962 Replacement).

4. The rule of this case was changed legislatively the very next year by the Arkansas Legislature. See Steele v. Gann, 197 Ark. 480, 123 S.W.2d 520 (1939).

1964). Ordinarily, the plaintiff must suffer some actual loss or damage in order to bring an action. Slight damage initiates the accrual of the cause of action. See Faulkner v. Huie, 205 Ark. 332, 168 S.W.2d 839 (1943); Prosser, *supra*, at 146–148.

▮ In this case, Mrs. Schenebeck complained of visual disturbances for several months, commencing in February of 1963. The defendant's literature advised that temporary blurring could accompany Aralen therapy. Any temporary blurring phenomena covered by the warning would not give rise to any cause of action for damages by Mrs. Schenebeck since that symptom constituted an expectable and predictable consequence of proper treatment. See Sterling Drug, Inc. v. Cornish, 370 F.2d 82 (8th Cir. 1966); Carmen v. Eli Lilly Co., 109 Ind.App. 76, 32 N.E.2d 729 (Ind.App.1941).

▮ Defendant suffered the burden of establishing its statute of limitations defense. Smith v. Milam, 195 Ark. 157, 110 S.W.2d 1062 (1937). The defendant was required to prove when plaintiff sustained permanent eye damage. On the other hand, plaintiff, having the verdict, has the benefit of every favorable inference reasonably justified by the evidence. See Meitz v. Garrison, 413 F.2d 895, 896 (8th Cir. 1969).

Three qualified ophthalmologists reported negative findings covering the period October of 1962 to October 11, 1963 on the examination of Mrs. Schenebeck's eyes. As we have heretofore noted, permanent toxic effects from the use of chloroquine result from its long therapy and the onset of the disease is slow and progressive. The disease in its early stages is difficult, if not impossible, to detect. Although visual field tests may be of greater assistance in detecting the early stages of chloroquine retinopathy than usual ophthalmoscope examinations of the interior of the eye, no such visual field tests were performed prior to December 9, 1963.

In November of 1963, Dr. Mayne wrote of visual defects possibly related to chloroquine without reference to permanence. On December 6, 1963, Dr. Patterson wrote of "fear" that Mrs. Schenebeck's visual impairment might be permanent. A fact finder might deem these statements as speculative.

▮ In our view, the evidence fails to conclusively establish that Mrs. Schenebeck sustained chloroquine retinopathy rather than temporary visual blurring prior to December 9, 1963. We conclude that the trial court properly submitted the statute of limitations issue to the jury for its resolution.

Affirmed.