Arthur RAYMOND

v.

ELI LILLY AND COMPANY.

Patricia RAYMOND

v.

ELI LILLY AND COMPANY.

Civ. A. Nos. 75–80 and 75–81.

United States District Court,
D. New Hampshire.

May 5, 1976.

W. Wright Danenbarger, Wiggin & Nourie, Manchester, N. H., for plaintiffs.

John A. Graf, McLane, Graf, Greene, Raulerson & Middleton, Manchester, N. H., R. H. Beatie, Ballantine, Bushby, Palmer & Wood, New York City, for defendant.

## MEMORANDUM OPINION

BOWNES, District Judge.

In this diversity action, plaintiff, Patricia I. Raymond, alleges that an oral contraceptive medication, C-Quens, manufactured and distributed by defendant, Eli Lilly and Company, caused hemorrhages of the optic nerves in each of her eyes leaving her legally blind.[1] Plaintiff is a resident of Nashua, New Hampshire. Defendant is a corporation which is incorporated in and has its principal place of business in the State of Indiana. The amount in controversy exceeds $10,000. Jurisdiction is conferred by 28 U.S.C. § 1332.

Defendant has moved for summary judgment on the grounds that the New Hampshire statutes of limitations bar plaintiff's action.

Plaintiff's complaint was filed in the Superior Court for Hillsborough County, New Hampshire, on February 28, 1975, and, upon defendant's petition, was removed to this court. Plaintiff's complaint raises three separate claims against defendant: one in negligence, one in breach of warranty, and one in strict liability. Defendant claims that plaintiff's cause of action accrued prior to February 28, 1969, and that her tort claims are barred by NH RSA 508:4 (Supp.

1975), and her contract claim by NH RSA 382–A:2–725.

Both parties have agreed that there are two central issues to be resolved at this juncture: first, whether or not New Hampshire's malpractice discovery rule in reference to the statute of limitations applies to a drug products liability case; and, second, if it does, should the plaintiff, in the exercise of reasonable diligence, have learned of the alleged causal connection between the oral contraceptives and her blindness prior to February 28, 1969. The New Hampshire discovery rule provides:

> . . . [A]ctions for malpractice based on the leaving of a foreign object in a patient's body do not accrue until the patient learns or in the exercise of reasonable care and diligence should have learned of its presence. *Shillady v. Elliot Community Hosp.*, 114 N.H. 321, 324, 320 A.2d 637, 639 (1974).

The first issue is a question of law properly to be resolved by this court on a motion for summary judgment. By agreement, the parties have submitted the second issue, one of fact, to this court for resolution on this motion. A hearing was held on March 24, 1976, and evidence in the form of plaintiff's testimony was taken. The parties have both submitted other evidence in the forms of depositions and medical records.

I rule that the New Hampshire discovery rule does apply in a drug products liability case and find that plaintiff is not barred by the New Hampshire statute of limitations.

## THE FACTS[2]

Patricia Raymond, thirty-five, is married and the mother of four children. She graduated from high school in Philadelphia and, after she became blind, went to college through the New Hampshire Department

---

1. In Civil Action No. 75–80, Arthur Raymond has sued defendant, Eli Lilly and Company, for damages resulting from his wife's blindness. His case rises and falls with the main action brought by his wife, Civil Action No. 75–81. Therefore, for the purposes of this opinion, the plaintiffs are treated as one.

2. The facts are taken from Mrs. Raymond's deposition, her in-court testimony and the medical records submitted by counsel. Unless directly quoted, the exact source is not cited.

of Vocational Rehabilitation and graduated in June of 1973. Prior to June, 1968, she had been employed as a receptionist, a secretary trainee, and a desk clerk receptionist. Her health had been good except for a variety of "female problems" for which she had several operations culminating in a total hysterectomy in December, 1968.

In early 1968, plaintiff experienced "female problems and stomach distress" and consulted her gynecologist, Robert R. Moheban, M.D. (Dep. at 52–53.) Dr. Moheban ran a series of tests on her and, unable to determine the exact nature of her problem, recommended a D & C (dilation and curettage). In order to schedule her for this procedure, he needed to regulate her menstrual periods and prescribed C-Quens, an oral contraceptive manufactured by defendant. Plaintiff filled the prescription on April 9, 1968, and renewed it on May 20, 1968. (Deft's. Ex. A.) At the end of May, in the middle of the second cycle of birth control pills, plaintiff experienced a "blurriness" in her left eye. (Dep. at 54.) She had problems focusing and was unable to perform her work as a desk clerk at the Nashua Country Club. She suffered no pain at any time. Within approximately one week, she consulted her regular ophthalmologist, Maurice Chagnon, M.D., who advised her "that it looked as if [she] had had a hemorrhage." (Dep. at 74.) Dr. Chagnon asked her if she was taking any medication. Plaintiff told him of the C-Quens, and he advised her to cease taking them "just as a precaution." (Dep. at 75.) In plaintiff's presence, Dr. Chagnon called Dr. Moheban's office, advised them of the situation and of his recommendation that Mrs. Raymond cease taking "the pill." Dr. Chagnon told plaintiff that he did not know what the cause of the hemorrhage was or whether she would regain the sight in her eye. "There was no way of knowing he said. We would just have to wait and see." (Dep. at 78.)

Prior to April 9, 1968, plaintiff had not taken any oral contraceptive nor did she take any after she was advised not to by Dr. Chagnon. Plaintiff was not informed by Dr. Moheban, the prescribing doctor, of any possible side effects from taking C-Quens other than some possible weight gain or swelling, spotting or bleeding. There was no discussion at all concerning plaintiff's eyes or any possible side effects that might concern her eyes. Plaintiff claimed that she did not receive at any time from Dr. Moheban or anyone else any writing or printed matter about C-Quens or any other oral contraceptive. Neither did she read anything about them in any outside source or discuss the subject with anyone.

Plaintiff continued to see Dr. Chagnon, her ophthalmologist, in June, 1968. He tested her, but prescribed no medication. She experienced some improvement in her peripheral vision in the left eye a couple of weeks after the initial hemorrhage. She stopped seeing Dr. Chagnon sometime in the summer of 1968.

In October, plaintiff went to the Lahey Clinic in Boston. Dr. Arthur F. Calnan, the head of the ophthalmology department at the Clinic, treated her. He gave her a cortisone injection, some oral cortisone, and referred her to the other departments of the Clinic for a complete examination. No systemic disease was found, but during her "work-up" the doctor in the Gynecology Department, Dr. Takacs, recommended that she have a hysterectomy. After that operation in December, 1968, she ceased to visit the Lahey Clinic until her right eye hemorrhaged in June, 1969.

The diagnosis of the Lahey Clinic is somewhat unclear. Plaintiff testified, both at her deposition and in court, that she was never given any indication by any doctor that there was a causal connection between the birth control pills and the hemorrhage in her left eye. She claimed that Dr. Calnan never told her of any specific diagnosis or prognosis either before or after the tests. She claims to have specifically "asked him if he thought it [the C-Quens] might have something to do with that, and he told me he didn't know, he didn't think so." (Record at 11.) Dr. Calnan's notes for Oc-

tober 11, 1968, in the medical record confirm that this was his initial response.

> Original opinion was that it was a sequellae to use of C-Quens birth control pill—later said no—idiopathic. The pills were used from April 26—May 15— V.A. began to decrease during the last 5 days of use. Pills discontinued on June 6 on advice of ophthalmologist.

The record reveals that on November 13 a decision was made to delay the hysterectomy until plaintiff's ophthalmology status was clarified. On December 13, Dr. Calnan noted:

> I favor hysterectomy if any possible relationship to BC pills which certainly exists here.

However, in the *Report on Eye Examination* given November 7, 1969, and dated December 30, 1969, Dr. Calnan found that the "Etiological factor responsible for primary eye condition" was "Unknown." He further noted that "Chances at improved vision now very small."

After her hysterectomy in December, 1968, Mrs. Raymond did not return to the Lahey Clinic until June 5, 1969. On June 4 she had a second hemorrhage of an optic nerve, this time in her right eye. She immediately consulted Dr. Chagnon, who called the Lahey Clinic directly and made an appointment for her. At the Clinic, Dr. Calnan recommended cortisone injections. She continued treatments at the Clinic through April, 1970. The medical record from this treatment period does not mention in any way plaintiff's consumption of the birth control pills.

Plaintiff stopped going to the Lahey Clinic in April, 1970. She continued to see Dr. Chagnon until 1973, when she went to Eduardo A. Lopez, M.D. Dr. Lopez continued the cortisone treatments started at the Lahey Clinic. Upon Dr. Lopez's recommendation, she went to Retina Associates in Boston in February, 1974, and was examined there by Robert J. Brockhurst, M.D. Neither Drs. Lopez nor Brockhurst assigned any cause to the hemorrhaging of plaintiff's eyes. Plaintiff claims that Dr. Brockhurst

stated that he didn't think that there was any causal connection between the C-Quens and her blindness. After her visit to Retina Associates, Dr. Lopez thought that there was nothing else he could do for Mrs. Raymond and stopped treatment. Plaintiff never recovered full vision in either eye and is presently considered legally blind.

Sometime in 1970 or 1971, plaintiff learned of a newspaper article concerning a woman who had recovered a verdict for blindness allegedly caused by oral contraceptives. At the hearing, Mrs. Raymond testified that ". . . . then we [Mr. and Mrs. Raymond] started to wonder about it, and we talked about it at length. But neither of us knew what we should do about it at this point." They "decided to go and see a lawyer and see if he could find out what were the circumstances behind it; in fact, get more information about it." (Record at 13–14.) They did at that time seek legal counsel. "After putting the matter in the hands of what we supposed to be a competent attorney, we then turned our attention to dealing with the problems caused by my blindness." (Affidavit of Plaintiff at 1–2.) Plaintiff asserts that she was assured by her attorney that he was working on the case. In late 1974, she became doubtful of the lawyer's competence and in January, 1975, sought further legal advice. The new lawyer suggested that plaintiff bring suit immediately. This action was filed on February 28, 1975.

## THE APPLICABILITY OF THE NEW HAMPSHIRE DISCOVERY RULE

■ The initial issue to be decided by this court is whether the highest court of the State of New Hampshire would apply the state's malpractice discovery rule to a drug products liability case. The rule provides:

> . . . actions for malpractice based on the leaving of a foreign object in a patient's body do not accrue until the patient learns or in the exercise of reasonable care and diligence should have learned of its presence. *Shillady, supra,* 114 N.H. at 324, 320 A.2d at 639.

Because there are no New Hampshire Supreme Court cases which directly address this issue, I must determine what the New Hampshire Court would most likely decide in this case. *Meredith v. Winter Haven,* 320 U.S. 228, 237, 64 S.Ct. 7, 12, 88 L.Ed. 9, 15 (1943).

> Nevertheless, even though a state's relevant law is unclear or difficult to ascertain, it is still our duty to render a decision by attempting to apprehend the result that the state courts would reach. *Patch v. Stanley Works (Stanley Chemical Co. Div.),* 448 F.2d 483, 488 (2d Cir. 1971).

In determining what course the New Hampshire Supreme Court would take if faced with the issue presented by this case, I am mindful of the admonition that

> . . . we must proceed with caution to avoid imposing a duty on [the defendant] which would not be imposed by the courts of New Hampshire. *MacLean v. Parkwood, Inc.,* 354 F.2d 770, 772 (1st Cir. 1966).

However, after careful consideration, *Shillady, supra,* 114 N.H. 321, 320 A.2d 637 in conjunction with other case law, leads me to believe that, under the facts of this case, the discovery rule would not be rigidly limited and that the rule followed in malpractice cases would be applied here.

I also determine that certification of this issue to the New Hampshire Supreme Court is not necessary. Counsel for both the plaintiff and the defendant have submitted this issue to this court for determination; there is no question of abstention, *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); and, finally, this court is not composed of " 'outsiders' lacking the common exposure to local law which comes from sitting in the jurisdiction." *Lehman Brothers v. Schein,* 416 U.S. 386, 391, 94 S.Ct. 1741, 1744, 40 L.Ed.2d 215, 220 (1974).

In actions for personal injuries, NH RSA 508:4 (Supp.1975), the appropriate statute of limitations for plaintiff's tort claims, states that:

> Except as otherwise provided by law all personal actions may be brought within six years after the cause of action accrued, and not afterwards.

The traditional interpretation of the statute of limitations held that the

> [n]ecessary elements of a cause of action based upon negligence are the causal negligence of the defendant, plus resulting harm to the plaintiff. Putting it another way, there must be negligence and harm, and they must have a causal connection. *White v. Schnoebelen,* 91 N.H. 273, 275, 18 A.2d 185, 186 (1941).

Under this reading, plaintiff's tort claims are clearly barred. The causal negligence of the defendant occurred upon the manufacture and the distribution of the birth control pills. The harm occurred to her when her first eye hemorrhaged in June, 1968. Although plaintiff has raised the argument that the harm did not occur until she was completely blind, in June of 1969, I find no merit in it. *Patrick v. Morin,* 115 N.H. ——, 345 A.2d 389 (1975) is dispositive. In that case, the New Hampshire Supreme Court held:

> It is not necessary . . . that [plaintiff's] ultimate damage . . . have occurred before the statute of limitations starts to run. She could have recovered that damage under proper proof in an action begun when the harmful effects of *defendant's discovered negligence* . . . became manifest . . . . *Id.,* 345 A.2d at 391. (Emphasis added.)

Therefore, under the traditional reading of the statute, plaintiff's cause of action accrued in June, 1968.

However, in 1974 in the *Shillady* case, the New Hampshire Supreme Court adopted the malpractice discovery rule. *Shillady* concerned a plaintiff who had retained a needle in her spine which had broken off during a spinal tap performed in 1940. Ms. Shillady had initially experienced a great deal of pain, but it had gradually subsided over the years. The needle was not discovered until 1971 when suit was immediately commenced. Finding it an " 'undue strain

upon common sense, reality, logic and simple justice' to say that a cause of action has accrued to plaintiff and has been outlawed before she was or should have been aware of its existence" the New Hampshire court found that Ms. Shillady's cause of action accrued when she ascertained the existence of the foreign object in her body. This was a logical extension of the fraudulent concealment doctrine which holds that, if a plaintiff's ignorance of either his injury or of the defendant's culpability is due to the fraudulent concealment on the part of the defendant, the action does not accrue until the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered the concealment or the harm.

> This rule . . . is based on the unfairness which would result to a plaintiff blamelessly ignorant of her injury whose action would be cut off before she was aware of its existence.

> \* \* \* \* \* \*

> . . . Adoption of the [malpractice discovery rule] is a reasonable interpretation of the terms and the purpose of the statute. *Shillady, supra,* 114 N.H. at 323–324, 320 A.2d at 638–639.

■ The New Hampshire Supreme Court has not considered the applicability of the discovery rule outside the area of medical malpractice,[3] but it is an issue that has been considered by other courts. While these decisions are not binding precedent on this court, I am free to evaluate the reasoning and weigh the conclusions reached by other courts faced with the same issue while deciding this case. *Glassman Construction Co. v. Fidelity & Casualty Co. of N. Y.,* 123 U.S.App.D.C. 1, 356 F.2d 340, 342 n.7, *cert. den.* 384 U.S. 987, 86 S.Ct. 1890, 16 L.Ed.2d 1005 (1966); *Summers v. Wallace Hospital,* 276 F.2d 831 (9th Cir. 1960); *Wendt v. Lillo,* 182 F.Supp. 56 (N.D.Iowa 1960). *See Wright, Federal Courts* § 58 at 240 (1970).

Both the Fifth and the Eighth Circuits have held that a state medical malpractice discovery rule applies to a drug products liability case. *Roman v. A. H. Robins Company, Inc.,* 518 F.2d 970 (5th Cir. 1975); *Schenebeck v. Sterling Drug, Inc.,* 423 F.2d 919 (8th Cir. 1970). In *Roman* the plaintiff was barred by the state two year statute of limitations because she had been advised five years prior to filing suit that there was probably a causal relationship between her physical injury, blindness, and the drug she had taken. In its holding, the court, without discussion, applied the heretofore unexpanded state medical malpractice discovery rule. In *Schenebeck* the plaintiff also knew of the causal relationship between her harm, again blindness, and the defendant's product long before she filed suit. However, because the plaintiff's physicians had relied on the defendant's published assurances as to the safety of the product and the temporary nature of the side effects, the court, in its application of the state discovery rule, found that the plaintiff was not barred on the theory that she had not been injured until she knew that she was permanently blind.[4] The discovery rule had been applied by the state courts only in medical malpractice and subjacent support cases.

Several federal district courts have also considered the question of whether a state's malpractice discovery rule applies to a products liability case. In *Goodman v. Mead Johnson & Co.,* 388 F.Supp. 1070 (D.N.J. 1974), the plaintiff had ceased to use the defendant's product three and one-half years before she filed suit in a jurisdiction that had a three year tort statute of limitations. Because the plaintiff had been aware of her condition, thrombophlebitis,

---

**3.** In *Roberts v. Richard & Sons, Inc.,* 113 N.H. 154, 304 A.2d 364 (1973), the New Hampshire Supreme Court refused to apply the discovery rule to a complaint which sounded in contract even though the plaintiff had alleged negligence.

> . . . the discovery exception has generally been limited to tort actions and the plaintiff's labeling of a count as tort is not determinative. *Id.* at 156, 304 A.2d at 366.

**4.** *See also, Sterling Drug, Inc. v. Cornish,* 370 F.2d 82 (8th Cir. 1966); *Withers v. Sterling Drug, Inc.,* 319 F.Supp. 878 (S.D.Ind.1970).

the question presented to the court was when did the plaintiff become aware of its alleged correlation with defendant's drug. In addressing this issue, the court applied the New Jersey discovery rule, even though the New Jersey courts had not applied the rule in a products liability case. The New Jersey courts had stated, however, that the doctrine should be applied ". . . in an appropriate case." *Lopez v. Swyer*, 62 N.J. 267, 300 A.2d 563, 565 (1973). In *Goodman* the suit was barred because plaintiff had filed three and one-half years after she knew she had an actionable claim.

In 1964, in the first of a series of statute of limitation cases, the federal court for the Eastern District of Pennsylvania applied the state's discovery rule in a case where the plaintiff's wife had contracted beryllium poisoning allegedly caused by the fumes from the operation of the defendant's manufacturing plant. The condition of plaintiff's wife had been diagnosed five years before she ascertained the alleged cause of her illness. The court applied the rule that "notice of the invasion of legal rights" was required even though the rule had previously been applied only in malpractice suits and subterranean property damage cases. *Daniels v. Beryllium Corporation*, 227 F.Supp. 591, 595 (E.D.Pa.1964). In 1967 the same court in a negligence action stated:

> We think the correct rule, distilled from the authorities, is this: the statute begins to run as of the date of the injury unless, in the exercise of reasonable diligence the plaintiff could not have ascertained defendant's culpability within the statutory period. *Carney v. Barnett*, 278 F.Supp. 572, 575 (E.D.Pa.1967).[5]

*Carney* held that the plaintiff was barred because his decedent had known of both the harm and the cause of the harm and "that with the use of reasonable diligence the suit

could have been instituted within two years." *Id.* at 575. In 1968 the court applied this rule to a drug products liability case before the state courts had had a chance to address the issue. *Hoeflich v. William S. Merrell Company*, 288 F.Supp. 659 (E.D.Pa.1968).

Finally, in Louisiana a federal district court applied the state malpractice discovery rule in an action brought against both the physician for malpractice and the drug company for negligence.

> Thus, as to both aspects of this suit, prescription would not begin to run until the plaintiff knew or, as a reasonable person, should have known that the product involved and/or the negligence of the physician caused the alleged injury. *Breaux v. Aetna Casualty & Surety Company*, 272 F.Supp. 668, 672 (E.D.La.1967).

The court found that the evidence showed that the plaintiff either knew or should have known of the causal nexus between his harm, deafness, and the defendant's drug. Louisiana's evolving discovery rule was recently reconsidered by the Fifth Circuit in *Nivens v. Signal Oil & Gas Co., Inc.*, 520 F.2d 1019 (1975), *cert. denied*, —— U.S. ——, 96 S.Ct. 1509, 47 L.Ed.2d 763, 44 U.S.L.W. 3560 (4/6/76). Nivens had unknowingly sustained a hairline fracture of the skull when he struck his head against an allegedly defectively designed cupboard door. The trial jury found that he had not known within the prescriptive period, nor should he have known, that he had sustained physical harm from the incident and had awarded damages. The Court of Appeals reversed.

> In this case Nivens knew of the incident and . . . the nasal drainage as a manifestation of abnormality, *he knew that his injuries were from an identified cause by an identifiable defendant.* * * These manifestations of injury and inju-

---

5. In 1974 the court refused to literally apply the language "defendant's culpability" to a personal injury case arising from an explosion. However, the court specifically reaffirmed that:

> . . . the statute begins to run from the time the plaintiff discovers the injury or the

cause of his harm or reasonably should have discovered such injury or cause. *Huber v. McElwee-Courbis Construction Co.*, 392 F.Supp. 1379, 1382 (E.D.Pa.1974).

ries actually known were in every sense 'sustained' under the Louisiana statute as construed. *Id.* at 1024. (Emphasis added.)

Counsel have brought to this court's attention two state cases which address the question of when a cause of action accrues in a drug products liability case. In *Gilbert v. Jones*, 523 S.W.2d 211 (Tenn.Ct.App. 1974), the court broadly construed the state malpractice discovery rule and applied it in a suit against a physician and a manufacturer of oral contraceptives. The court found that the statute of limitations did not begin to run until the plaintiff "was apprised of this causal relationship between her high blood pressure and the contraceptive pills." *Id.* at 213. Ruling the other way, the Illinois Supreme Court in *Berry v. G. D. Searle & Co.*, 56 Ill.2d 548, 309 N.E.2d 550 (1974), another birth control pill case, held that the statute of limitations began to run as soon as the plaintiff became aware of the harm that she had suffered. The court specifically refused to hold that the statute began to run when the plaintiff knew or should have known of the causal relationship between the pills she had taken and her physical difficulties.

▆▆ When there is no state law on a question, a federal court may look to its own prior decisions. *Entron, Inc. v. General Cablevision of Palatka*, 435 F.2d 995 (5th Cir. 1970); *Merritt-Chapman & Scott Corp. v. Pennsylvania Turn. Com'n*, 387 F.2d 768 (3d Cir. 1967). Accordingly, I will consider this court's decision in *Nelson v. Volkswagen of America, Inc.*, 315 F.Supp. 1120 (D.N.H.1970), in which I held that the New Hampshire statute of limitations in a products liability case begins to run from the date of the alleged injury rather than the date of the sale of the product.[6]

. . . [W]here the consumer is dependent on a remote manufacturer for many of the products he uses[,] [t]he "repose" of the manufacturer must give way to the welfare of the consuming public, and if this means liability *in perpetuity*, so be it. *Id.* at 1122. (Emphasis in original.)

In *Nelson*, the plaintiffs had become aware of the alleged defect in the defendant's product only when they were injured in the process of using it. But, unlike the plaintiff in the present case, they knew immediately that their harm was due to the fault of someone: the fault was either theirs, the defendant's, the other driver's or a combination of all of these; but it was clear that the accident was not purely spontaneous. Here, the plaintiff alleges that she had no reason to suspect that her blindness was due to the fault of another and was, in fact, advised by her physicians that it was probably idiopathic. In other words, plaintiff knew that she had been harmed, but not that she had been injured in the legal sense that she had sustained an invasion of a protected interest.

The United States Supreme Court used the distinction between an awareness of a harm and knowledge of an injury in deciding when the Federal Employers' Liability Act's statute of limitations begins to run. *Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). Urie had contracted silicosis during thirty years of work as a fireman on steam locomotives. The silicosis, a slowly developing disintegration of the lungs, was first diagnosed in 1940. Suit was filed in 1941. In holding that Urie was not barred, the Court stated:

Nor do we think those consequences can be reconciled with the traditional purposes of statutes of limitations, which conventionally require the assertion of claims within a specified period of time after *notice of the invasion of legal rights*. *Id.* at 170, 69 S.Ct. at 1025, 93 L.Ed. at 1292. (Emphasis added.)

*Accord, Quinton v. United States*, 304 F.2d 234 (5th Cir. 1962) (medical malpractice suit, discovery rule applicable). *See Ricciu-*

---

**6.** This court is not aware of any New Hampshire Supreme Court product liability case which addresses the issue of when a cause of action accrues in strict liability. Therefore, *Nelson* is still the law in this jurisdiction.

ti v. Voltarc Tubes, Inc., 277 F.2d 809 (2d Cir. 1960) (strict liability case, federal discovery rule applied where no state law applicable). The Court found it anomalous to charge Urie with knowledge of his cause of action even before he knew that harm had occurred to him.

Plaintiff's situation is not unlike that of the malpractice victim, and a drug can be likened to a hidden instrument left in the body of an unsuspecting patient. Both suffer the onset of physical harm a considerable period of time prior to the discovery of the alleged cause of that harm, and both the malpractice victim and the victim of drug side-effects may be unaware for some time that they are suffering an invasion of a protected interest. In the instant case, the plaintiff experienced a sudden and unexpected hemorrhage in her left eye, a harm of which she was immediately aware. Like all Americans, she uses and consumes an endless variety of products every day, and she alleges that she had no reason to make any connection at all between any single product that she had used and the blindness inflicted upon her.

■ Following the reasoning of Shillady, Nelson and Urie, I hold that in a drug products liability case, the New Hampshire statute of limitations, NH RSA 508:4 (Supp. 1975), does not begin to run until the plaintiff is aware or, in the exercise of reasonable diligence, should have been aware of his or her injuries. "[I]f this means [for the defendant] liability in perpetuity, so be it." Nelson, supra, 315 F.Supp. at 1122.

## APPLICATION OF THE DISCOVERY RULE

Having concluded that the New Hampshire discovery rule applies in this case, I now turn to the issue of whether, prior to February 28, 1969, the plaintiff knew or, in the exercise of reasonable diligence, should have known that she had an actionable claim. I note that in several of the cases cited above, this determination of fact was left for the jury, e. g., Schenebeck, supra,

423 F.2d 919. However, in the instant case, counsel, by agreement, have submitted this factual issue to this court for resolution.

■ The facts are virtually undisputed and have already been recited. Defendant, as the moving party, carries the burden of establishing that the plaintiff is barred by the operation of the statute as interpreted by this court.

Initially, defendant asserts that plaintiff knew or should have known of the alleged causal relationship between her blindness and defendant's product when Dr. Chagnon, the first ophthalmologist she visited, took her off "the pill." I disagree. Plaintiff states that she was told by Dr. Chagnon that this was "just a precautionary measure." Plaintiff also testified that she understood that she was thoroughly tested at the Lahey Clinic precisely because the doctors were looking for a cause of her problems. Further, she was specifically told by the doctors that they didn't know whether the C-Quens might have been the cause. The search for cause and the professed ignorance of the physicians could only serve to emphasize to plaintiff the precautionary nature of Dr. Chagnon's advice. I conclude that Dr. Chagnon's action of taking plaintiff off "the pill" was insufficient to warn plaintiff that there was a correlation between the drug and her vision problems.

■ Defendants also rely upon the December 13, 1968, notation by Dr. Calnan:

I favor hysterectomy if any possible relationship to BC pills which certainly exists here.

This notation is the single piece of evidence which clearly gives a medical opinion as to a causative link. Defendant has not submitted any evidence that this notation was seen by plaintiff or that its message was conveyed to her, and plaintiff denies knowing of any opinion by Dr. Calnan as to the cause of the hemorrhage. The question is, therefore, should the plaintiff, in the exercise of reasonable diligence, have known of this opinion. In fact, this notation is but one comment in the middle of the medical

record which both begins and ends with negative opinions by Dr. Calnan as to causation. On October 11, 1968, the doctor wrote that he thought her condition was "idiopathic," and on December 30, 1969, he stated that the "Etiological factor responsible for primary eye condition" was "Unknown." Further, this notation must also be considered in light of all the evidence. Plaintiff asserts that her several physicians all made inconclusive remarks as to any possible causative link between "the pill" and her blindness; at best, a few gave her negative opinions. She asserts that the very reason she sought a lawyer in 1971 was to get some information. "I wanted to know what was going on, what I had to look forward to or if this was just one thing with me. So we went to see Mr. . . ." (Record at 99.) I cannot charge plaintiff with knowledge of the exact contents of her medical record. In light of the medical record taken as a whole and the oral assurances she says she received from her physicians, I conclude that "reasonable diligence" in this situation does not include actual research into a medical record.

■ Finally, defendant claims that the Physicians' Desk Reference (PDR) and the package inserts for C-Quens which were given to all prescribing physicians contained information about visual side-effects. As of October 2, 1967, (Affidavit John Graf, Esq.) the PDR and the inserts contained this warning:

> The following occurrences have been observed in users of oral contraceptives. A cause-and-effect relationship has been neither established nor disproved.

> \*   \*   \*   \*   \*   \*

> Neuro-ocular lesions. PDR at 775 (1968) (Deft's. Ex. D).

Defendant contends that this fact should be considered by this court in deciding whether plaintiff, in the exercise of reasonable diligence, should have known of the alleged causal relationship. Defendant has not established that this information was conveyed by plaintiff's physicians to her, and I do not think that "reasonable diligence"

includes, for the average consumer, research into technical volumes such as the PDR or into package inserts specifically designed for physicians. And, even assuming that such research could be included within the meaning of "reasonable diligence," I find, as a matter of fact, that, in this case, it is not. Plaintiff asked her physicians whether there might be a causative link, and she was told that they didn't know. A reasonable person could well assume that a physician would be aware of the information released by the manufacturer, and that, at the very least, had read the inserts provided by the company and would convey that information to the patient if asked. Plaintiff, once she received an answer to her inquiries, should not be expected to research material she could properly conclude had already been read by her physicians. Further, I find that the unanimity of ignorance expressed to her by her various physicians could only serve to impress upon her the unavailability of any medical explanation for her difficulties.

■ In conclusion, I find, as a matter of fact, that the plaintiff did not know of a correlation between her consumption of the C-Quens and the hemorrhages of her eyes prior to February 28, 1969. Further, I conclude that, under these circumstances, the exercise of reasonable diligence would not have led her to believe that there was a causative link between them. From the evidence submitted to this court, I find that plaintiff had no reason to believe that her blindness was other than idiopathic until she learned, through the newspaper article, that another user of oral contraceptives had suffered the same fate. She then had reasonable grounds to believe that there might be a causal connection between her blindness and defendant's drug. At that time, her cause of action accrued.

■ As a final step in deciding whether or not plaintiff should receive the benefit of the discovery rule, I must identify, evaluate and weigh the interests of each of the parties to determine whether "harsh and unjust results [would] flow from a rigid and

automatic adherence to a strict rule of law." *Shillady, supra,* 114 N.H. at 325, 320 A.2d at 639. Defendant has not shown that its interests have changed or been prejudiced in any way by the delay in this case. A rigid application of the statute of limitations would begin the period of prescription before plaintiff had any knowledge or reason to know that she was the victim of any invasion of a protected interest and would bar her completely from any remedy. Through no fault of either the plaintiff or the defendant, the filing of this action was delayed approximately eight months after the end of the strict prescription period. Because the defendant has shown neither prejudice nor intentional delay on the part of the plaintiff, I find that to bar plaintiff would be a harsh result.

Therefore, defendant's motion for summary judgment as to plaintiff's complaint in strict liability is denied.

Based on the same reasoning, defendant's motion for summary judgment as to plaintiff's complaint in negligence is also denied.

## BREACH OF WARRANTY

Plaintiff, in Count II of her complaint, alleges breach of express and implied warranties. It is unclear whether New Hampshire recognizes an action for breach of implied warranty at common law. *Stephan v. Sears Roebuck & Co.,* 110 N.H. 248, 250, 266 A.2d 855 (1970); *Nelson, supra,* 315 F.Supp. 1120. The existing causes of action under New Hampshire Commercial Code provisions, NH RSA 382–A:2–313, 314 and 315, together with the doctrine of strict liability, provide a plaintiff with a complete remedy, thus mitigating the need for a common law cause of action in breach of implied warranty. *Stephan, supra,* 110 N.H. at 250, 266 A.2d 855. Therefore, any claim plaintiff has for relief for a breach of warranty must be based on New Hampshire's provisions of the Uniform Commercial Code.

NH RSA 382–A:2–725(1) establishes a four year statute of limitations for any action based upon a contract for sale. The statute begins to run from the time a cause of action accrues, which is when the breach occurs. The breach of warranty occurs when the tender of delivery is made regardless of the aggrieved party's knowledge of the breach. NH RSA 382–A:2–725(2). Plaintiff's last purchase of C-Quens was on or about May 20, 1968, more than four years prior to the commencement of her action. She is, therefore, barred from pursuing her breach of warranty claim against defendant by NH RSA 382–A:2–725(1).

Defendant's motion for summary judgment as to Count II is granted.

SO ORDERED.