MOLL v ABBOTT LABORATORIES

HARRINGTON v ABBOTT LABORATORIES

Docket Nos. 93309, 93310, 91561. Argued March 2, 1993 (Calendar Nos. 3-4). Decided September 21, 1993.

Jean Moll and Michael Moll, her husband, brought a products liability action in the Wayne Circuit Court against Abbott Laboratories, Eli Lilly & Co., and other manufacturers of DES, alleging latent toxic injuries arising from its use. The court, James E. Mies, J., denied Eli Lilly's motion for summary disposition on the basis of the three-year statute of limitations, finding that the claim did not accrue until the plaintiff had proof that her mother had ingested DES. The Court of Appeals, REILLY, P.J., and SHEPHERD, J. (MARILYN J. KELLY, J., concurring in the result only), affirmed, holding that a cause of action does not accrue until the plaintiff discovers, or through the exercise of reasonable diligence should have discovered, the injury and what a likely cause of the injury was, and determined that a factual dispute existed regarding when the plaintiff discovered that DES was the likely cause of her injuries (Docket Nos. 115542, 115550). The defendants appeal.

Judith Harrington and others brought a products liability action in the Wayne Circuit Court against Abbott Laboratories and other manufacturers of DES, alleging latent toxic injuries arising from its use. The court, James E. Mies, J., granted summary disposition for the defendants on the basis of the three-year statute of limitations, concluding, as a matter of law, that the plaintiff knew or should have known of her cause of action when she was diagnosed with a T-shaped uterus. The Court of Appeals, McDONALD, P.J., and MICHAEL J. KELLY and GRIFFIN, JJ., affirmed in an unpublished opinion per curiam (Docket No. 115438). The plaintiff appeals.

In an opinion by Chief Justice CAVANAGH, joined by Justices BRICKLEY, RILEY, and GRIFFIN, the Supreme Court held:

The discovery rule controls the determination of when a

REFERENCES

Am Jur 2d, Limitation of Actions § 107; Products Liability § 919.

Statute of limitations: running of statute of limitations on products liability claim against manufacturer as affected by plaintiff's lack of knowledge of defect allegedly causing personal injury or disease. 91 ALR3d 991.

cause of action accrues in a pharmaceutical products liability action. The statute of limitations begins to run when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered a possible cause of action. In the absence of disputed facts, the question whether a plaintiff's action is barred by the statute of limitations is one of law, to be determined by the trial court.

1. The applicable period of limitation for a products liability action is three years and begins to run on the date a claim accrues. A plaintiff harmed by a prescribed pharmaceutical product is often unaware of resulting latent injuries. If the three-year period of limitation were to begin to run at the time of the defendant's breach, most, if not all, claims would be barred before the plaintiff had reason to know of the injury and its cause. Thus, application of the discovery rule is appropriate in such cases to furnish a reasonable time for injured plaintiffs to seek legal redress for their injuries.

2. A cause of action for personal injuries is stated when a plaintiff alleges that the defendant owed the plaintiff a legal duty and breached that duty, that the breach was the proximate cause of the injury, and that damages were suffered. In a pharmaceutical products liability action, the defendant's duty and breach generally predate the plaintiff's awareness of an injury and its cause. Under the discovery rule, the plaintiff's claim accrues when the plaintiff discovers, or through the exercise of reasonable diligence should have discovered, an injury and the causal connection between the injury and the defendant's breach—a possible cause of action. The plaintiff then has a duty to diligently pursue the resulting claim. The cause of action accrues when, on the basis of objective facts, the plaintiff should have known of an injury, even if a subjective belief regarding the injury occurs at a later date. The discovery rule applies to the discovery of an injury, not the discovery of a later-realized consequence of the injury. Once a DES injury is discovered, a plaintiff has three years to seek legal and medical counsel regarding the claim and resulting damages.

3. In the absence of disputed facts, the question whether a plaintiff's cause of action is barred by the statute of limitations is one of law to be determined by the trial court.

4. Because neither plaintiff filed suit within three years of discovering a possible cause of action, the statute of limitations bars these actions.

*Moll,* reversed.

*Harrington,* affirmed.

Justice Boyle, concurring in part and dissenting in part,

stated that there is no difference between "possible" and "likely" as the quantum of fact that triggers the statute of limitations under the discovery rule. The concept of reasonable diligence is implicit in the discovery rule and the reasonable person test is sufficiently flexible to permit fact-specific application regarding whether a plaintiff knew or should have known of the fact of injury and a causal connection. Because the statute of limitations is an affirmative defense, all inferences favor the nonmoving party. Applying the test in *Moll,* there is a question whether the plaintiff was reasonably diligent in discovering the operative cause of her injury, requiring remand to the trial court for further proceedings.

A plaintiff need not know that an invasion of a legal right has been suffered before a cause of action accrues. It is one thing to say that the discovery rule is triggered when a plaintiff knows of the fact of an injury and a causal connection, and another to say there is a distinction between "possible" and "likely" as the quantum of fact triggering the discovery rule. Common sense and reason dictate that the limitation period does not begin to run until a plaintiff knows of an injury and can reasonably determine what or who caused it. *Moll* involves the question of someone's wrongdoing, not in the sense of a known breach of a legal duty, but whether there is a connection between the plaintiff's condition and some causal factor. If there were evidence in the record in *Moll* to suggest that the plaintiff could have learned of the defendant's responsibility had she exercised due diligence, summary judgment would be appropriate.

Whether it can be said as a matter of law that a plaintiff has exercised reasonable diligence turns on the nature of the injury, its symptoms, and available medical knowledge. In *Moll* the issue is not the injury, but who or what hurt the plaintiff and whether, as a matter of law, the plaintiff should have discovered the cause of the injury. Remand is required in *Moll,* not for a determination whether DES was a "likely" cause of her hooded cervix, but rather for a determination whether, given the circumstances presented, a plaintiff exercising due diligence would have discovered the operational cause of the injury. If, from the facts presented, a jury could reasonably conclude that the plaintiff acted diligently in pursuing who or what caused her injury, summary judgment should be denied.

Justice MALLETT, dissenting, stated that Judith Harrington's suit should not be barred by the statute of limitations. She did not know, nor should she have known, of her injury on December 27, 1983, because it did not manifest itself until

April 1984, and thus her suit was not precluded until April 1987.

Justice LEVIN, dissenting, stated that in the context of actions claiming injury as a result of exposure to DES, the concept of reasonable diligence should include as factors that a woman who learns that she may have a serious reproductive disorder and who is anxious to have children, although advised that she may be a victim of defective drugs, initially may take steps to address her medical problem in light of available medical information and the course of treatment prescribed by her physician, and be more concerned about her health and achieving conception, than abandoning such efforts in favor of recourse to the courts.

In *Moll,* the issue of the plaintiff's diligence should not have been decided summarily. On the basis of the record, the trier of fact could conclude that she was reasonably justified in focusing on solving her medical problems rather than immediately searching to discover whether DES was a cause of those problems. In all events she made a good-faith attempt to find whether DES was a cause, without success. A reasonable trier of fact could conclude that due diligence required no more.

In *Harrington,* considering the unique nature of DES-related harms, a reasonable trier of fact could conclude that the plaintiff should not have known of her injury before learning of her infertility. Exposure to DES can have multiple effects, and not all the effects are harms or injuries at the instant that the DES effect is discovered. When Harrington first learned of her uterine condition, it was not causing her any harm, and she was reasonably justified in not considering it to be a present injury. Only after she discovered that the physical abnormality would prevent her from conceiving and carrying a child to term did she know that she had been harmed.

The undisputed facts in both *Moll* and *Harrington* are subject to conflicting inferences. Because the answers to the questions posed are far from clear, judgment as a matter of law is not appropriate.

192 Mich App 724; 482 NW2d 197 (1991) reversed.

LIMITATION OF ACTIONS — PRODUCTS LIABILITY — DISCOVERY RULE — PHARMACEUTICAL PRODUCTS.

The discovery rule controls the determination of when a cause of action accrues in a pharmaceutical products liability action; the statute of limitations begins to run when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered a possible cause of action; in the absence of disputed

facts, the question whether a plaintiff's action is barred by the statute of limitations is one of law, to be determined by the trial court (MCL 600.5805[9], 600.5827; MSA 27A.5805[9], 27A.5827).

*Barr & Associates* (by *Charles J. Barr*) for the plaintiffs.

*Shook, Hardy & Bacon* (by *Andrew See* and *Michelle R. Mangrum*) and *Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Kathleen A. Lang* and *Mary Beth Kelly*) for defendant Eli Lilly & Company.

*Plunkett & Cooney, P.C.* (by *Robert G. Kamenec*), for defendant E. R. Squibb & Sons, Inc.

Amici Curiae:

*Bowman & Brooke* (by *Lawrence C. Mann* and *Terrence E. Haggerty*) for the Product Liability Advisory Council, Inc.

*Brian J. McKeen* and *Thomas H. Bleakley* for Michigan Trial Lawyers Association.

CAVANAGH, C.J. In these pharmaceutical products liability actions, we are asked to determine when a cause of action for latent toxic injuries accrues for statute of limitations purposes. We hold that the discovery rule controls the determination of when a cause of action accrues in a pharmaceutical products liability action. Thus, the statute of limitations begins to run when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered a possible cause of action. Furthermore, we hold that in the absence of disputed facts, the question whether a plaintiff's action is barred by the statute of

limitations is a question of law, to be determined by the trial judge.

## I

## A

### *HARRINGTON v ABBOTT LABORATORIES*

Plaintiff Judith Harrington[1] was born on August 5, 1955, in Detroit, Michigan. Her mother, Theresa Harrington, ingested DES[2] during her pregnancy with Judith. Judith Harrington first became aware of her exposure to DES in utero in the latter part of 1974. At this time, Dr. Bryce, the Harrington family physician, informed Theresa Harrington by letter of her ingestion of DES and the associated reproductive problems found in DES daughters. The letter suggested that Judith Harrington consult a physician specializing in DES problems.

On the advice of Dr. Bryce, Judith visited Dr. Vakhariya on January 2, 1975, who informed her that she had a mosaic on her cervix, a precancerous condition. Although a biopsy revealed that the tissue was benign, Dr. Vakhariya recommended

---

[1] This action was originally filed under the plaintiff's married name Judith Wrook. Mrs. Wrook's husband, Kenneth, joined in the original claim. On February 3, 1989, Judge Mies granted Mrs. Wrook's motion to amend the caption, to Judith Harrington. Additionally, Mr. Wrook was dismissed as a plaintiff. This opinion will refer to the plaintiff by her maiden name, Judith Harrington.

[2] Diethylstilbestrol (DES) is a synthetic estrogen which was prescribed by doctors to pregnant women who had a history of miscarriages or were otherwise at risk in carrying their pregnancy to term. . . . While the mother is exposed to DES during pregnancy, cancer and other genital abnormalities will not be manifested until the DES daughter (or, in some cases, son) reaches adolescence or early twenties. [Glessner, *Torts—Limitations statutes—Application of the Pennsylvania statute of limitations discovery rule in DES cases*—O'Brien v Eli Lilly & Co, *668 F2d 704 (CA 3, 1981),* 55 Temple L Q 1149, n 3 (1982).]

that Judith have semiannual checkups to monitor her condition.

In 1983, Judith Harrington consulted Dr. Laham because of her inability to conceive a child. Dr. Laham informed Judith of her mosaic cervix and advised her that this condition could be caused by DES exposure.[3] The doctor also opined that Judith's difficulty in conceiving could be the result of DES exposure. Dr. Laham eventually referred Judith to a reproductive specialist, Dr. Stern, for an extensive examination of her uterus.

Dr. Stern performed a hysterosalpingogram (HSG)[4] on December 27, 1983. On the same day, Dr. Stern apprised Judith of the test results, informing her that she had a bicornuate or T-shaped uterus, a condition that can result from DES exposure, and that could be the cause of her difficulty in conceiving.

In the early part of 1984, Judith became pregnant. Dr. Laham treated the pregnancy as high-risk because of her exposure to DES. The doctor placed various restrictions on Judith and her activities. Unfortunately, the precautions proved futile, and Judith miscarried in April of 1984. She learned from Dr. Laham that her uterine deformities caused her miscarriage. Believing that she would experience the same problem with future pregnancies, Dr. Laham advised her not to attempt another pregnancy.

On December 30, 1986, Judith, along with fourteen other named plaintiffs,[5] filed suit against the

---

[3] According to the plaintiff, every doctor she consulted, informed her of her mosaic cervix, that this was a precancerous condition, and that it could have been caused by her exposure to DES in utero.

[4] An HSG involves the injection of dye into the uterus and fallopian tubes to enable a physician to view the structure of the uterus. *Sloane-Dorland Annotated Medical Legal Dictionary,* West, p 362.

[5] The original complaint named fifteen plaintiffs, including plaintiff Moll and her husband, as well as over two hundred defendants. *Pew v*

defendants, manufacturers of des.[6] Defendant Eli
Lilly & Company, on behalf of all of the defen-
dants, motioned for summary disposition pursuant
to MCR 2.116(C)(7), claiming that the three-year
products liability, statute of limitations[7] barred the
plaintiff's suit. Following oral arguments and
based upon the pleadings, interrogatory responses,
and the sworn deposition of Judith Harrington,
Wayne Circuit Court Judge James Mies granted
the defendants' motion. Judge Mies concluded, as
a matter of law, that Judith knew or should have
known of her cause of action when Dr. Stern
diagnosed her bicornuate or t-shaped uterus on
December 27, 1983. The Court of Appeals affirmed
in an unpublished per curiam opinion. We granted
leave to appeal on November 2, 1992. 441 Mich
878. We affirm.

### B

### MOLL v ABBOTT LABORATORIES

Plaintiff Jean Moll[8] became aware of the irregu-
larities in her cervix during a gynecological exami-
nation by Dr. Ulmer in April of 1975. Because of
the condition of her cervix, Dr. Ulmer asked Jean
if she had had an abortion.

In August of 1976, Jean visited another gynecol-

*Abbott Laboratories,* Wayne Circuit Court Docket No. 86-636745-NP,
filed December 30, 1986. Judge Mies severed the plaintiffs' claims
into separate lawsuits in response to E. R. Squibb's motion to sever.
The date of filing the separate actions continued to be the date of
filing the original complaint: December 30, 1986.

[6] Various defendants have been dismissed from the cases because of
the impossibility that they provided the des ingested by the plaintiffs'
mothers.

[7] MCL 600.5805(9); MSA 27A.5805(9).

[8] Michael Moll joins his wife, Jean Moll, as plaintiffs. Because Mr.
Moll's loss of consortium claim is derivative and dependent on Mrs.
Moll's claim, and to avoid confusion, we shall refer only to the
plaintiff, Jean Moll, throughout this opinion.

ogist, Dr. O'Campo, who informed her that she had a hood over her cervix. Dr. O'Campo indicated that Jean's condition could have resulted from exposure to DES in utero. Dr. O'Campo requested the medical records of Jean's mother.

Jean's mother, Shirley Petroff, recalled being hospitalized for a month during her pregnancy with Jean. She also recalled that her doctor, Dr. Brownell, had administered medication to prevent her unborn child from aborting. Mrs. Petroff, however, could not recall the name of the prescribed drug. Attempting to ascertain what drug Dr. Brownell had administered, Jean and her mother contacted Dr. Brownell's office to inquire about the needed medical records. Dr. Brownell's receptionist informed Mrs. Petroff that the records had been sent elsewhere. Further attempts to locate the records were unsuccessful.

In 1977, Dr. O'Campo advised Jean that her cervix "didn't look good" and that the problem "might be due to the DES that [her] mother had taken . . . ." Following the doctor's recommendation, Jean submitted to another test, a colposcopy, which took place in January of 1978. Following the test, the doctor told Jean that "the results . . . were . . . fine" and "there was no cause for real concern at that time," but that she had an "incompetent cervix" and this type of problem could have been caused by exposure to DES. The doctor also told the plaintiff that exposure to DES could lead to cancer.

The plaintiff attempted to conceive a child in 1978. After approximately a year, she grew concerned over her inability to conceive and consulted Dr. O'Campo. In February of 1979, Dr. O'Campo told the plaintiff that the hood over her cervix could be preventing conception. Furthermore, the doctor informed Jean that her exposure to DES in

utero possibly could have caused the hood on her cervix.

In May of 1980, Dr. O'Campo suggested that the Molls undergo a series of fertility tests because of their continued inability to conceive. These tests were never performed, however, because Jean did not consult Dr. O'Campo again until 1985. Jean was once again informed that the hood on her cervix was the probable cause of her infertility. The plaintiff also learned at the time that her incompetent cervix could cause difficulties in carrying a child to term.[9]

Jean Moll filed suit against the defendants, manufacturers of DES, on December 30, 1986.[10] On July 8, 1988, Judge Mies granted Eli Lilly's[11] motion for summary judgment pursuant to MCR 2.116(C)(10), because of the plaintiff's inability to prove that her mother ingested DES, a requirement for alternative liability.[12] The court delayed entry of the order, however, until September 9, 1988, to allow Jean additional time to locate Mrs. Petroff's medical records. With the aid of a court order, Jean located Mrs. Petroff's medical records at the Highland Park City Clerk's office. The records confirmed that Dr. Brownell had administered DES to Mrs. Petroff.

In December of 1988, the defendant Eli Lilly[13] moved for summary judgment pursuant to MCR 2.116(C)(7). The defendant claimed that Jean Moll's suit was barred by the applicable three-year

[9] The plaintiff testified that she received additional information on DES and its accompanying physical complications from magazine and newspaper articles.

[10] See n 5.

[11] The other defendants concurred in Eli Lilly's motion.

[12] *Abel v Eli Lilly & Co,* 418 Mich 311; 343 NW2d 164 (1984).

[13] The other defendants concurred in Eli Lilly's motion.

statute of limitations[14] because she knew of a possible cause of action for more than three years before filing suit. On the basis of the pleadings, interrogatory responses, and the sworn deposition testimony of plaintiff Moll and her mother, Mrs. Petroff, Judge Mies denied the defendant's motion, finding that the plaintiff's claim did not accrue until she had proof that her mother ingested DES.

The Court of Appeals affirmed the denial of Eli Lilly's motion for summary disposition on different grounds. It rejected the trial court's contention that a cause of action does not accrue until the plaintiff could prove each element of her claim. The panel also rejected the line of cases holding that a plaintiff's cause of action accrues when she discovers or should have discovered the existence of a possible cause of action. 192 Mich App 724, 731; 482 NW2d 197 (1992). Instead, the Court held "that a plaintiff's cause of action does not accrue until the plaintiff discovers or through the exercise of reasonable diligence should have discovered that the plaintiff has been injured and what a likely cause of the injury was." The panel determined that a factual dispute existed regarding when Jean discovered that DES was the likely cause of her injuries. Accordingly, the trial court's denial of Lilly's motion was affirmed. We granted the defendants' application for leave to appeal on November 2, 1992. 441 Mich 878. We reverse.

II

The applicable period of limitation for a products liability action is three years. MCL 600.5805(9); MSA 27A.5805(9). The limitation period begins to run on the date a claim accrues, which is controlled by statute:

---

[14] MCL 600.5805(9); MSA 27A.5805(9).

Except as otherwise expressly provided, the period of limitations runs from the time the claim accrues. The claim accrues at the time provided in sections 5829 to 5838, and in cases not covered by these sections the claim accrues at the time of the wrong upon which the claim is based was done regardless of the time when damage results. [MCL 600.5827; MSA 27A.5827.]

In *Connelly v Paul Ruddy's Equipment Repair & Service Co,* 388 Mich 146; 200 NW2d 70 (1972), we held that the term "wrong," as used in the accrual statute, specified the date on which the defendant's breach harmed the plaintiff, as opposed to the date on which the defendant breached his duty. Common sense dictated such an interpretation because, if the date of the defendant's breach designated the date of accrual, then the plaintiff's claim could be barred before a plaintiff suffers an injury.[15] Similarly, our concern about barring a plaintiff's cause of action prematurely has led to our adoption of the discovery rule under the proper circumstances.

In *Johnson v Caldwell,* 371 Mich 368, 379; 123 NW2d 785 (1963),[16] this Court adopted the discov-

---

[15] "Except in topsy-turvy land, you can't die before you are conceived, or be divorced before ever you marry, or harvest a crop never planted, or burn down a house never built, or miss a train running on a non-existent railroad. For substantially similar reasons, it has always heretofore been accepted, as a sort of legal 'axiom,' that a statute of limitations does not begin to run against a cause of action before that cause of action exists, i.e., before a judicial remedy is available to the plaintiff." [*Patterson v Her Majesty Industries, Inc,* 450 F Supp 425, 428, n 5 (ED Pa, 1978), quoting *Dincher v Marlin Firearms Co,* 198 F2d 821, 823, n 5 (CA 2, 1952) (Frank, J., dissenting).]

[16] Superseded by statute as stated in *Hawkins v Regional Medical Laboratories, PC,* 415 Mich 420, 428, n 2; 329 NW2d 729 (1982) ("*Dyke* [v *Richard,* 390 Mich 739; 213 NW2d 185 (1973)], entitled a plaintiff to a two-year extension on the limitations period from the time of discovery of malpractice. 1975 PA 142 has since reduced the extension to six months from the time of discovery or two years from last treatment, whichever is greater").

ery rule for medical malpractice cases. In doing so, we noted: "[I]t would be 'illogical and unintelligent' to require a patient to determine on the date he last consults a physician that malpractice has taken place, when he in fact relies upon the advice that constitutes the malpractice. So to hold would punish the patient who relies upon his doctor's advice and places a premium on skepticism and mistrust." We also adopted the discovery rule in negligent misrepresentation cases. "[I]s there a tort cause of action accruing before plaintiff has knowledge, or should have knowledge, of the negligent misrepresentation? We think not." *Williams v Polgar,* 391 Mich 6, 25; 215 NW2d 149 (1974). Likewise, we have applied the discovery rule in products liability actions for asbestos related diseases, *Larson v Johns-Manville Sales Corp,* 427 Mich 301; 399 NW2d 1 (1986).

In these consolidated cases, the plaintiffs argue that the discovery rule applies in pharmaceutical products liability claims. We agree.[17] Similar to a plaintiff in an asbestos case, a plaintiff harmed by a prescribed medication is most often unaware of latent resulting injuries. If the three-year period of limitation began to run at the time of the defendant's breach, most, if not all, claims would be barred before the plaintiff had reason to know of the injury and the cause of the injury. Such an interpretation seeks "to declare the bread stale before it is baked." *Fleishman v Eli Lilly & Co,* 96 AD2d 825, 826; 465 NYS2d 735 (1983) (Gibbons, J., concurring in part and dissenting in part).

Furthermore, the policies behind the statute of limitations do not preclude the use of the discovery rule in pharmaceutical products liability cases.

---

[17] While *Abel,* n 12 *supra,* did not specifically address the applicability of the discovery rule in DES cases, our holding implicitly approved of the application.

This Court discussed the policies underlying the statute of limitations in *Bigelow v Walraven,* 392 Mich 566, 576; 221 NW2d 328 (1974), where we stated:

> Statutes of limitations are intended to "compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend"; "to relieve a court system from dealing with 'stale' claims, where the facts in dispute occurred so long ago that evidence was either forgotten or manufactured"; and to protect "potential defendants from protracted fear of litigation."

Nevertheless, as properly noted by the Court of Appeals, application of the discovery rule is appropriate in pharmaceutical products liability cases.

> "With respect to the problem of lost or inaccurate evidence due to the passage of time, several reasons exist why the potential for prejudice to the defendant is not significant in a drug case of this kind. Most of the evidence necessary to prove or defend against liability is likely to be documentary in nature. It is not the kind of evidence that is lost or becomes unreliable as time passes. Companies generally compile and maintain research records that document the extent of their knowledge of the harmful propensities of their drugs. Certainly, doctors and hospitals meticulously maintain and store records of patient treatments. . . . Additionally, unlike the situation in most cases, the passage of time in a drug case is likely to increase both the amount and the accuracy of the evidence —in this case the scientific community's knowledge of the causal relationship between certain drugs and injury or disease. Finally, we note that manufacturers are in a superior position to control the discovery of the hazards of their products. 'Through the processes of design, testing, inspection and collection of data on product safety performance in the field, the manufacturer has virtu-

ally exclusive access to much of the information necessary for effective control of dangers facing product consumers. Indeed, the strict principles of modern products liability law evolved in part to motivate manufacturers to use this information to help combat the massive problem of product accidents.' Owen, *Punitive Damages in Products Liability Litigation,* 74 Mich L R 1258 (1976). We do not think that in suits such as the instant one 'the passage of time would increase problems of proof or entail the danger of false, fraudulent, frivolous, speculative or uncertain claims.' " [*Bonney v Upjohn Co,* 129 Mich App 18, 33-34; 342 NW2d 551 (1983).]

Because the purpose of the statute of limitations is not offended by the application of the discovery rule in pharmaceutical products liability cases, and because adoption of the discovery rule will furnish a reasonable time for injured plaintiffs to seek legal redress for their injuries,[18] we hold that the discovery rule governs the date of accrual for pharmaceutical products liability cases.

III

A cause of action for personal injuries accrues

---

[18] The general power of the legislature to pass statutes of limitation is not doubted. The time that these statutes shall allow for bringing suits is to be fixed by the legislative judgment, and where the legislature has fairly exercised its discretion, no court is at liberty to review its action, and to annul the law, because in their opinion the legislative power has been unwisely exercised. But the legislative authority is not so entirely unlimited that, under the name of a statute limiting the time within which a party shall resort to his legal remedy, all remedy whatsoever may be taken away. . . . It is of the essence of a law of limitation that it shall afford a reasonable time within which suit may be brought and a statute that fails to do this cannot possibly be sustained as a law of limitations, but would be a palpable violation of the constitutional provision that no person shall be deprived of property without due process of law. [*Price v Hopkin,* 13 Mich 318, 324-325 (1865). Citations omitted.]

when a plaintiff can allege, in a complaint, each element of the asserted claim. Generally, a well-pleaded claim for personal injury must allege that (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the duty, (3) the defendant's breach was the proximate cause of the plaintiff's injuries, and (4) damage. *Connelly* at 150. However, in a pharmaceutical products liability action, as in other cases in which we have applied the discovery rule, the defendant's duty and breach generally predate the plaintiff's awareness of an injury and of its cause. Accordingly, under the discovery rule, the plaintiff's claim accrues when the plaintiff discovers, or through the exercise of reasonable diligence, should have discovered, the two later occurring elements: (1) an injury, and (2) the causal connection between plaintiff's injury and the defendant's breach. See, generally, *Caldwell, Polgar,* and *Larson, supra.*

### A

At oral argument, the plaintiffs' counsel urged the Court to adopt a DES-specific discovery rule that would forestall the running of the applicable statute of limitations until the plaintiff perceived herself to be injured. Counsel reasoned that the proposed rule would promote the strong policies articulated in *Abel* and allow a totally blameless plaintiff to seek legal redress against a tortfeasor.

Certainly, adoption of a subjective test would give a plaintiff a greater opportunity to bring suit against an alleged wrongdoer. But this approach would also vitiate the statute of limitations as a defense.[19] In enacting the three-year statute of

---

[19] It has . . . come to be recognized that the statute of limita-

limitations, the Legislature has provided a time limitation that in its judgment gives a plaintiff a reasonable opportunity to investigate a cause of action.[20] This Court has recognized specific situations in which the discovery rule must be utilized to prevent unjust results. See *Johnson, Polgar,* and *Larson, supra.* While we have provided judicial relief to plaintiffs whose actions would be barred by the statute of limitations through no fault of their own, *id.,* we will not encourage and cannot allow a plaintiff to sleep on an objectively known cause of action.

Adoption of a subjective test would allow a DES plaintiff to legally forestall suit until the time she is convinced that she is injured.

> If plaintiff prevails on question at issue here, that point is never reached until a plaintiff is subjectively certain of the cause of the injury. That, of course, will never be more than three years prior to filing the complaint because the date of such "discovery" will be completely under the control of the plaintiff. [*Keith-Popp v Eli Lilly & Co,* 639 F Supp 1479, 1482 (WD Wis, 1986).]

If the Legislature had deemed it appropriate to permit a plaintiff discretion to bring suit, it never would have enacted a statute of limitations or would have provided a specific exception for DES victims.

We have consistently held that under the discovery rule, a cause of action accrues when "the claimant knows or should have known of the disease [injury] . . . ."[21] While the term "knows"

---

tions is not a disfavored plea but a perfectly righteous defense . . . . [*Bigelow* at 570.]

[20] See *Price,* n 18 *supra* at 324-325.
[21] *Larson* at 304.

is obviously a subjective standard, the phrase
"should have known" is an objective standard
based on an examination of the surrounding cir-
cumstances.    Consequently,    we    find    that    a
plaintiff's cause of action accrues when, on the
basis of objective facts, the plaintiff should have
known of an injury, even if a subjective belief
regarding the injury occurs at a later date. Such
an interpretation leaves the statute of limitations
as a viable defense and promotes the policies
underlying the adoption of the statute of limita-
tions.

Michigan jurisprudence compels not only the
use of an objective standard for determining when
an injury is discovered, but it also compels strict
adherence to the general rule that "subsequent
damages do not give rise to a new cause of action."
*Larson* at 315. The discovery rule applies to the
discovery of an injury, not to the discovery of a
later realized consequence of the injury.

In *Larson,* we held that an action for the asbes-
tos-related disease, asbestosis, accrues at the time
a plaintiff knows or should have known of the
disease, and not at the time of exposure to the
asbestos. We also held that a plaintiff who devel-
ops cancer as a result of asbestos exposure may
bring suit within three years of when the cancer
was or should have been discovered, regardless of
whether asbestosis had developed before the three-
year limitation period, in cases where a prior
action had not been brought.[22] *Larson* at 304-305.
We reasoned that deviation from the general rule
was warranted because cancer and asbestosis are

---

[22] In *Larson,* we emphasized the limited scope of our holding:

[W]e are not deciding in this case whether a claimant who
*did* file a suit to recover for asbestosis may file a second suit for
cancer at a later date. [*Id.* at 305, n 1. Emphasis in original.]

two distinct diseases that result from asbestos exposure. " 'It is widely accepted by the scientific community that asbestosis and cancer are not medically linked, that is, cancer is not an outgrowth or complication of asbestosis.' " *Id.* at 315, n 6. We premised our decision in *Larson* on the independence of the asbestos-related diseases, and we specifically noted the narrow application of the exception to asbestos claims.

A review of the facts in *Harrington* clearly reveals that the plaintiffs' injuries, in the cases at bar, are not independent diseases warranting a departure from the general rule. Plaintiff Judith Harrington claims that her infertility is her injury and that until her miscarriage she was not aware of this injury. Judith Harrington confuses, however, her DES-related physical abnormality (her injury) with a later realized consequence of this physical abnormality. The exposure to DES in utero caused physical abnormalities in her uterus, namely, a bicornuate or T-shaped uterus. Because of this injury, she had difficulty conceiving and carrying a pregnancy to term. The full extent of Judith Harrington's injury and subsequent damage related to her physical abnormality (i.e., her infertility) was fully detectable at the time of initial discovery of her injury. Her infertility was an outgrowth of her deformed uterus.[23] In order to promote finality and prevent overburdening of our judicial resources, we adhered to the general principle that the discovery of an injury commences the running of the statute of limitations.

[23] Because neither plaintiff advances a claim for cancer, and thus the record provides no evidence of a link between the physical abnormalities a DES daughter may experience and clear cell adenocarcinoma, a DES-related cancer, we do not resolve: (1) Whether a DES daughter's cause of action for cancer is barred by earlier *knowledge* of a DES-related physical abnormality, or (2) whether a DES daughter's cause of action for cancer is barred by an earlier *suit* for a DES-related physical abnormality.

"Thus, if there is a coincidence of a negligent act with the fact of some damage, the cause of action comes into being and the statute of limitations begins to run even though the ultimate damage is unknown or unpredictable." [*Larson* at 315, quoting 51 Am Jur 2d, Limitation of Actions, § 136, p 706.]

Once a plaintiff discovers a DES injury, she has three years to consult with the legal and medical community about her claim and resulting damages. To hold that the statute of limitations did not begin to run until the plaintiff realized additional consequences of her physical abnormality[24] would circumvent the clear intent of the Legislature to promote prompt resolution of claims.

**B**

The Court of Appeals panel in *Moll* rejected the discovery rule standard as set forth in *Bonney,* where the Court of Appeals stated:

A plaintiff's cause of action accrues when he discovers or, through the exercise of reasonable diligence, should have discovered that he has a *possible* cause of action. [*Bonney* at 24. Emphasis added.]

In rejecting *Bonney's* characterization of the discovery rule, the *Moll* panel reasoned:

We agree that the discovery rule should be employed in the present case. However, we find

---

[24] "A later injury from the same tortious act does not restart the running of the statute." The only thing that has changed [by the adoption of the discovery rule] is that accrual of a cause of action occurs at the time of discovery of the injury rather than at the time of injury. [*Keith-Popp* at 1483, quoting *Segall v Hurwitz,* 114 Wis 2d 471, 482; 339 NW2d 333 (1983).]

that the phrase "possible cause of action" as used in *Bonney* and the later cases inappropriately implies that a plaintiff's claim accrues once the plaintiff discovers or should have discovered that there is *any possibility* that all the elements of a cause of action exist. Rather, we believe that the proper interpretation of the discovery rule in the context of the present case is that a plaintiff's cause of action does not accrue until the plaintiff discovers or through the exercise of reasonable diligence should have discovered that the plaintiff has been injured and what a likely cause of the injury was. To trigger the running of the period of limitation, the plaintiff need only have information that would lead a reasonable person to be aware, or after diligent inquiry to become aware, of the plaintiff's injury and a likely cause of the injury. In either situation, the potential litigant will be considered to have received sufficient notice to allow the limitation period to begin to run. It is not necessary that the plaintiff be able to prove each element of the cause of action before the statute of limitations takes effect.[25] *Fidler v Eastman Kodak Co,* 555 F Supp 87, 91 (D Mass, 1982), aff'd 714 F2d 192, 199 (CA 1, 1983). [192 Mich App 731.]

The Court of Appeals interpretation increases the period before which a plaintiff's claim accrues

---

[25] In both the trial court, as well as the Court of Appeals, plaintiff Jean Moll argued "that because ingestion of DES by her mother is an *essential element* of her cause of action, accrual did not occur until she found the hospital records that *proved* ingestion." 192 Mich App 729. (Emphasis added.) While the trial court agreed with this reasoning, the Court of Appeals rejected the argument, stating that the plaintiff need not be able to prove her cause of action before the statute of limitations begins to run. The question when a cause of action accrues for statute of limitations purposes is not whether the plaintiff has knowledge of sufficient facts to prevail on a claim, but whether the plaintiff has knowledge of sufficient facts to cause a reasonable person to pursue an investigation that could uncover the evidence needed to lead to an ultimate victory. Because the plaintiff failed to cross-appeal this part of the Court of Appeals decision, and because we discern no need to act sua sponte on this issue, that portion of the Court of Appeals decision will not be disturbed.

under the discovery rule because a "possible cause of action" generally will be discovered before a "likely cause" of injury. Because we find that such an interpretation upsets the balance sought between the judicially created discovery rule and the legislatively mandated statute of limitations, we hold that *Bonney's* characterization of the discovery rule is the proper standard.

The *Moll* panel's interpretation of the discovery rule raises the level of certainty with respect to causation. According to Black's Law Dictionary (6th ed), p 925, the term "likely" is defined as:

> Probable. *Horning v Gerlach,* 139 Cal App 470 [471-473]; 34 P2d 504, 505 [1934]. In all probability. *Neely v Chicago Great Western R Co,* 14 SW2d 972, 978 [Mo App, 1928]. Likely is a word of general usage and common understanding, broadly defined as of such nature or so circumstantial as to make something probable and having better chance of existing or occurring than not. *People v Randall,* 711 P2d 689, 692 [Colo, 1985].

The term "possible," on the other hand, connotes a lesser standard of information needed to provide knowledge of causation. Black's Law Dictionary defines the term "possible" as:

> Capable of existing, happening, being, becoming or coming to pass; feasible, not contrary to nature of things; neither necessitated nor precluded; free to happen or not; contrasted with impossible. [*Id.* at 1166.]

When determining the appropriate standard for the discovery rule, we must keep in mind the policy reasons prompting the adoption of the statute of limitations, as well as the discovery rule, and choose the interpretation that best promotes both policies and does the least amount of damage

to the respective principles of law.[26] In *Lothian v Detroit,* 414 Mich 160, 166-167; 324 NW2d 9 (1982), we articulated the policy considerations prompting the adoption of the statute of limitations:

> They encourage the prompt recovery of damages; they penalize plaintiffs who have not been industrious in pursuing their claims; they "afford security against stale demands when the circumstances would be unfavorable to a just examination and decision"; they relieve defendants of the prolonged fear of litigation; they prevent fraudulent claims from being asserted; and they "remedy . . . the general inconvenience resulting from delay in the assertion of a legal right which it is practicable to assert." [Citations omitted.]

As discussed earlier, this Court has adopted the discovery rule to prevent the barring of claims before the claimant's realization of a cause of action. See *Johnson, Polgar,* and *Larson, supra.*

While the Court of Appeals applicable test of a "likely cause" obviously addresses our concern against barring a plaintiff's cause of action prematurely, it also wreaks havoc with the legislative policies underlying the statute of limitations. The statute of limitations encourages claimants to investigate and pursue causes of action. It alleviates defendants' continued fear of litigation following a legislatively mandated time period.[27] A "likely cause" standard is inapposite to such policies.

We find that the best balance is struck in the

[26] See, generally, *Yustick v Eli Lilly & Co,* 573 F Supp 1558, 1566 (ED Mich, 1983).

[27] The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them. [*Order of R Telegraphers v Railway Express Agency,* 321 US 342, 349; 64 S Ct 582; 88 L Ed 788 (1944).]

use of the "possible cause of action" standard. This standard advances the Court's concern regarding preservation of a plaintiff's claim when the plaintiff is unaware of an injury or its cause, yet the standard also promotes the Legislature's concern for finality and encouraging a plaintiff to diligently pursue a cause of action. Once a claimant is aware of an injury and its possible cause, the plaintiff is aware of a possible cause of action. We see no need to further protect the rights of the plaintiff to pursue a claim, because the plaintiff at this point is equipped with sufficient information to protect the claim.[28] This puts the plaintiff, whose situation at one time warranted the safe harbor of the discovery rule, on equal footing with other tort victims whose situation did not require the discovery rule's protection. This position is consistent with the jurisprudence of our state.

> "It is not necessary that a party should know the details of the evidence by which to establish his cause of action. It is enough that he knows a cause of action exists in his favor, and when he has this knowledge, it is his own fault if he does not avail himself of those means which the law provides for prosecuting or preserving his claims." [*Kroll v Vanden Berg*, 336 Mich 306, 311; 57 NW2d 897 (1953).]

Additional support for our adoption of a "possible

[28] Contrary to the dissent's claim, the majority's approach does not advocate prematurely filing suit, instead it advocates, in harmony with the statute of limitations, diligently pursuing and investigating a possible cause of action, once the plaintiff's cloak of ignorance is swept away. A DES plaintiff is then similarly situated with other tort victims who have three years to investigate and bring suit. The majority's approach provides the plaintiff with the opportunity to bring suit while simultaneously recognizing the Legislature's desire, as announced in the statute of limitations.

cause of action" standard[29] is found in other cases applying the discovery rule.[30]

[29] In *Bowen v Eli Lilly & Co, Inc,* 408 Mass 204, 207; 557 NE2d 739 (1990), the Massachusetts Supreme Judicial Court addressed the "level of notice of causation a plaintiff must have to trigger the running of the statute of limitations." The court characterized the standard as a "likely standard," yet required a lesser quantum of information than "likely" to commence the running of the statute of limitations. The court itself specifically found that the "likely standard" did not require a finding of probability on the issue of causation.

> The plaintiff argues that the reference to "notice of likely cause" in the quoted language means that a plaintiff must have probable cause to believe that the defendant's acts were the cause of her physical injuries before the statute begins to run. There is no Massachusetts case law in support of this view. The Court of Appeals opinion does not adopt that position. Our Appeals Court did not read the Court of Appeals opinion as the plaintiff claims when it said: "Massachusetts does not require discovery of each of the elements of the cause of action—duty, breach, causation, and damages before the limitation clock in [Mass Gen Laws, ch 260, § 4] starts ticking. . . . Rather, the three-year limitations period commences to run when a reasonably prudent person (in the tort claimant's position), *reacting to any suspicious circumstances of which he might have been aware* (what the Court of Appeals in *Fidler* called 'likely cause'), should have discovered that he had been harmed by his physician's treatment. . . ." *Malapanis v Shirazi,* 21 Mass App 378, 382-383 [487 NE2d 533] (1986). We do not require that a plaintiff have notice of a breach of a duty before a cause of action may accrue, but we do require that a plaintiff have (1) knowledge or sufficient notice that she was harmed and (2) knowledge or sufficient notice of what the cause of harm was. [*Id.* at 208. Emphasis added.]

Thus, the Court of Appeals reliance on *Bowen* to justify abandoning the *Bonney* "possible cause of action" standard is misplaced. Not only did the *Bowen* court explicitly acknowledge that a lesser quantum of information causes a claim to accrue, but the application of the discovery rule to the *Bowen* facts reveals a standard more analogous to Michigan's "possible cause of action" standard.

[30] See also *Kullman v Owens-Corning Fiberglas Corp,* 943 F2d 613, 616 (CA 6, 1991) (the United States Court of Appeals for the Sixth Circuit, in construing Michigan law, held that a plaintiff's claim for asbestos-related lung disease accrued when the plaintiff was aware of his injury, that it was caused by dust, and that the dust in his work environment contained asbestos; the court rejected the plaintiff's claim that the cause of action did not accrue until a definite diagnosis of asbestosis had been rendered); *Fidler v Eastman Kodak,* 714 F2d 192, 200 (CA 1, 1983) (the court held that a plaintiff's cause of action

IV

The final question we must resolve is whether a plaintiff's request for a jury trial prohibits a trial judge from granting a motion for summary disposition based on the statute of limitations. We hold that in the absence of disputed facts, the question whether a plaintiff's cause of action is barred by the statute of limitations is a question of law to be determined by the trial judge.

We have long recognized that a jury is charged with resolving disputed facts. *Kroes v Harryman,* 352 Mich 642, 648; 90 NW2d 444 (1958); *Christiansen v Hilber,* 282 Mich 403, 407; 276 NW 495 (1937); *Peoples Wayne Co Bank v Wolverine Box Co,* 250 Mich 273, 279; 230 NW 170 (1930). However, "[b]efore a jury is ever reached a preliminary decision must always be made, namely, whether or not there is anything to go to a jury." *Kroes* at 646. Where the facts of a case are uncontroverted and the only question left is what legal conclusions can be drawn from the facts, the question is for the court and not the jury. *Kroes* at 648; *Coddington v Robertson,* 160 Mich App 406, 410; 407 NW2d 666 (1987).

Both our court rules[31] and case law recognize the desirability of allowing summary disposition, regardless of a jury request, when uncontroverted facts are presented to the court. This promotes efficiency and preservation of judicial resources.

The summary judgment law provides a speedy

---

accrued when she learned of information that "was enough to lift the issue of causation out of the realm of the 'inherently unknowable' wrong"); *Grigsby v Sterling Drug Inc,* 428 F Supp 242, 244 (D DC, 1975) (the court held that the plaintiff's claim accrued when her doctor informed her that there was "a possibility" that the medication manufactured by the defendant caused her hearing loss).

[31] See, generally, MCR 2.116(C)(1) through (10).

method of determining whether there are any issues of fact in causes arising upon contract, judgment, or statute. If there are such issues of fact, the motion for summary judgment is denied, and the issues are left for a jury to determine; if there are no questions of fact, *the judge applies the law in accordance with the admitted facts as disclosed by the affidavits.* [*Peoples Wayne Co Bank* at 277-278. Emphasis added.]

While we do not tolerate usurping the province of the jury,[32] we do permit courts to determine a case when only a question of law exists. We permit courts to act in this manner as seen in summary judgment proceedings pursuant to MCR 2.116(C)(1) through (10),[33] a grant of a directed verdict,[34] as well as a judgment notwithstanding the verdict.[35]

While a court must be cautious when dismissing a claim pursuant to summary disposition,[36] it does

---

[32] "At best any standard describes an approach or judicial attitude. The dominant characteristics of the approach or attitude in Michigan are that the right to trial by jury must be preserved, and that directed verdicts are drastic steps which should not be taken unless reasonable men could not differ on each and every element of the party's claim." [*Napier v Jacobs,* 429 Mich 222, 232; 414 NW2d 862 (1987), quoting Martin, Dean & Webster, Michigan Court Rules Practice (3d ed), R 2.515, § 5, p 229.]

[33] *DiFranco v Pickard,* 427 Mich 32, 54; 398 NW2d 896 (1986) (when there is no genuine issue with respect to any material fact and reasonable minds could not differ regarding the legal conclusions to be drawn from the facts, summary judgment is appropriate).

[34] *Gooch v Wachowiak,* 352 Mich 347, 351; 89 NW2d 496 (1958) ("When the undisputed facts or all the testimony, construed in the light most favorable to plaintiff, fail to show want of probable cause a verdict for defendant should be directed").

[35] *Cunningham v Garber,* 361 Mich 90, 94; 104 NW2d 746 (1960). ("There being no dispute of facts on the controlling issues and no inferences or version of the facts possibly favorable to plaintiff, it was, therefore, the duty of the court to enter judgment *non obstante veredicto* for defendants.") See also *May v William Beaumont Hosp,* 180 Mich App 728; 448 NW2d 497 (1989).

[36] "In deciding motions for and reviewing orders granting or denying, summary disposition, directed verdict and judgment notwith-

not have to remain idle in the presence of undisputed, uncontroverted facts. In this situation, the only question remaining is what legal conclusion can be drawn from the facts. This question is to be decided as a matter of law by the trial judge.

V

On the basis of the foregoing principles, we hold that the statute of limitations bars Judith Harrington's and Jean Moll's lawsuits. The uncontroverted deposition testimony of Judith Harrington reveals that as of December 27, 1983, she knew of (1) her bicornuate or T-shaped uterus, and (2) the possible link between her DES exposure and the deformity of her uterus. She not only knew of her injury, but its possible cause. Accordingly, she knew or should have known of her possible cause of action on December 27, 1983. Consequently, she had until December 27, 1986, to consult with the legal and medical community in order to ascertain the full extent of her damages and to file suit. Her failure to file suit by December 27, 1986, compels us to hold that the statute of limitations bars her claim.

standing the verdict, the court must view the evidence in the light most favorable to the nonmoving party . . . ." *DiFranco,* n 33 *supra* at 38. If reasonable minds could disagree about the conclusions to be drawn from the facts, a fact question exists that must be presented to the jury. When there is no genuine issue with respect to any material fact and reasonable minds could not differ regarding the legal conclusions to be drawn from the facts, summary judgment can be granted without violating the right to a jury trial. *Id.* at 54.

In the cases at bar, reasonable jurors could not differ regarding when the plaintiffs knew, or with reasonable diligence should have known, of their possible causes of action. The undisputed facts reveal the dates when the plaintiffs became aware of their injury and its suspected cause, the facts that provide the basis of their possible causes of action. The law does not oblige a trial judge to sit idle and present the issue to a jury when the undisputed facts support but one conclusion. It is imperative to recognize, however, that a contrary scenario would command strict adherence to the recognized right of trial by jury. See MCR 2.116(I)(3).

The uncontroverted deposition testimony of Jean Moll reveals that as of August 1976 she knew of (1) her hooded cervix, and (2) the possible link between DES exposure and her deformed cervix. She not only knew of her injury, but its possible cause. Accordingly, she knew or should have known of her possible cause of action no later than August of 1976. Consequently, she had until August 1979 to consult with the legal and medical community in order to ascertain the full extent of her damages and to file suit. Her failure to file suit by August 1979 compels us to hold that the statute of limitations bars her claim.

## VI

The discovery rule controls the determination of when a cause of action accrues in a pharmaceutical products liability action. We hold that under the discovery rule, the statute of limitations begins to run when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered a possible cause of action. Furthermore, we hold that in the absence of disputed facts, the question whether a plaintiff's action is barred by the statute of limitations is a question of law, to be determined by the trial judge.

The law imposes on a plaintiff, armed with knowledge of an injury and its cause, a duty to diligently pursue the resulting legal claim. Because neither Judith Harrington nor Jean Moll filed suit within three years of discovering their possible causes of action, the statute of limitations bars their suits.[37]

---

[37] "It would have been an idle ceremony, under the evidence, to have submitted the case to the jury, for the direct, positive and uncontradicted evidence presented an issue of law for the court and not an issue of fact for the jury." [*Christiansen* at 407. Citations omitted.]

Accordingly, we affirm the Court of Appeals holding in *Harrington* and reverse the Court of Appeals holding in *Moll.*

BRICKLEY, RILEY, and GRIFFIN, JJ., concurred with CAVANAGH, C.J.

BOYLE, J. (*concurring in part and dissenting in part*). I agree that the discovery rule applies in pharmaceutical products liability claims and with the Court's conclusion that plaintiff Harrington knew or should have known of her claim on December 27, 1983. I write separately because I disagree with the result in *Moll,* and because I am concerned that the Court's rationale unnecessarily restricts development of the discovery rule.

In my view, there is no difference between "possible" and "likely" as the quantum of fact that triggers the statute under the discovery rule. The concept of reasonable diligence is implicit in the discovery rule and the reasonable person test is sufficiently flexible to permit fact-specific application regarding whether a plaintiff knew or should have known of the fact of injury and a causal connection. Finally, because the statute of limitations is an affirmative defense, all inferences favor the nonmoving party. Applying this test, I believe that there is a question whether plaintiff Moll was reasonably diligent in discovering the operative cause of her injury. I would remand to the trial court for further proceedings.

The Court of Appeals in *Moll* correctly rejected the contention that the discovery rule is not triggered until plaintiff knows or should know of "all the elements of a cause of action," including the defendant's breach of duty. *Bonney v Upjohn Co,* 129 Mich App 18, 26-27; 342 NW2d 551 (1983).

To the extent that *Bonney* suggested in dicta

that the statute does not begin to run until the plaintiff discovers "each element of his cause of action," *id.* at 24, that suggestion is incorrect. As the Court of Appeals observed in *Moll,* quoting from *United States v Kubrick,* 444 US 111; 100 S Ct 352; 62 L Ed 2d 259 (1979), adoption of a standard that deferred accrual until plaintiff knew, or could reasonably be expected to know, of the defendant's breach of duty, or until the plaintiff had reason to suspect, or was aware of facts that would have alerted a reasonable person to the possibility, that a legal duty to him had been breached, " 'would go far to eliminate the statute of limitations as a defense separate from the denial of a breach of duty.' " 192 Mich App 734. In short, a plaintiff need not know she has suffered an invasion of a legal right before a cause of action accrues.

It is one thing, however, to say as the majority does that the discovery rule is triggered when a plaintiff knows of the fact of an injury and a causal connection, and another to say there is a distinction between "possible" and "likely" as the quantum of fact triggering the discovery rule. Indeed, in *Kubrick* itself, the Court, narrowly interpreting the government's waiver of immunity under the Federal Tort Claims Act, held that plaintiff's claim accrued when he learned it was "highly possible" that his hearing loss was the result of neomycin treament. 444 US 114. To be sure, the notice of cause cannot await subjective belief in the linkage between injury and cause in fact. To delay operation of the discovery rule to this point would emasculate the diligence requirement of the rule. Nor, for the same reason, is it necessary that the plaintiff have a definitive professional opinion regarding the injury or its cause.

*Kroll v Vanden Berg,* 336 Mich 306, 311; 57 NW2d
897 (1953).

Beyond these observations, it is, in my judg-
ment, unwise to introduce a new battleground, i.e.,
the distinction between whether the cause-in-fact
connection is "possible" or "likely" into the statute
of limitations arena. In fact, courts using the
"likely" cause formulation have relied on testi-
mony that plaintiff was told of the "possibility" of
the causal connection. *Fidler v E M Parker Co,
Inc,* 394 Mass 534; 476 NE2d 595 (1985). In my
view, common sense and reason dictate that the
limitation period does not begin to run until a
plaintiff knows he has been injured and can rea-
sonably determine what or who hurt him. *Bayless
v Philadelphia Nat'l League Club,* 579 F2d 37 (CA
3, 1978). As in *Bayless, Moll* involves the question
of someone's wrongdoing, not in the sense of a
known breach of a legal duty, but whether there is
a connection between plaintiff's condition and
some causal factor. Thus, if there were evidence in
the record in *Moll* to suggest that plaintiff could
have learned of defendant's responsibility had she
exercised due diligence, summary judgment would
be appropriate.

With the doctrine of reasonableness as a con-
stant and the standard of due diligence as a guide,
courts are able to determine when a plaintiff knew
or should have known of an injury and its possible
or likely cause, as well as whether there is a
disputed issue of fact that requires jury resolution.
Without a flexible approach, the purpose of adopt-
ing the discovery rule for latent injuries, as well as
the procedural presumption favoring the nonmov-
ing party on summary disposition, will be under-
mined.

The discovery rule is applied to a growing vari-
ety of situations in which the nature of the injury

and the difficulty of discovering its cause pose inherent difficulties calling for amelioration of the harsh consequences of the accrual rule. The nature of the information necessary and the quality of the requisite knowledge will vary from case to case and "more than that, from type of case to type of case." *Vispisiano v Ashland Chemical Co,* 107 NJ 416, 434; 527 A2d 66 (1987). As the court in *DuBose v Kansas City S R Co,* 729 F2d 1026, 1031 (CA 5, 1984), stated, whether a "plaintiff may be charged with awareness that his injury is connected to some cause should depend on factors including how many possible causes exist and whether medical advice suggests an erroneous causal connection or otherwise lays to rest a plaintiff's suspicion regarding what caused his injury." See also *Errichiello v Eli Lilly & Co,* 618 F Supp 484 (D Mass, 1985).

Whether it can be said as a matter of law that a plaintiff has exercised reasonable diligence turns on the nature of the injury, its symptoms, and available medical knowledge. Where a plaintiff experienced bleeding between periods, nausea, and diarrhea, but was told by her physician that she was asymptomatic and that she did not have pelvic inflammatory disease, began her lawsuit within three years of consulting another doctor who removed her IUD and told her she probably had PID, the court found that the plaintiff could not be expected as a matter of law to "personally diagnose her condition or consult with a physician more frequently than she did." *Hansen v A H Robins, Inc,* 113 Wis 2d 550, 561; 335 NW2d 578 (1983). Illustrating the same principle in the context of the latent injury of asbestosis, the court in *Morgan v Johns-Manville Corp,* 354 Pa Super 58; 511 A2d 184 (1986), held that summary judgment was properly granted regarding one shipyard

worker who had been informed by a physician that he had asbestosis, but had improperly granted the motion regarding another shipyard worker who had been informed only that an x-ray showed pleural thickening. With regard to the latter plaintiff, the court stated:

> Whether or not [the plaintiff] exercised due diligence and thus should have known that pleural thickening was an injury is also at issue here. We do not believe that the facts "lead unerringly to the conclusion that the length of time it took the plaintiff to discover the injury or its cause was unreasonable as a matter of law." [354 Pa Super 66. Citation omitted.]

In *Moll,* the issue is not the injury, but who or what hurt plaintiff and whether, as a matter of law, plaintiff should have discovered the cause of the injury. I would remand *Moll,* not for the determination ordered by the Court of Appeals, i.e., whether DES was a "likely" cause of her hooded cervix, but rather for a determination whether, given the circumstances presented, a plaintiff exercising due diligence would have discovered the operational cause of the injury. If, from the facts presented, a jury could reasonably conclude that plaintiff acted diligently in pursuing who or what caused her injury, summary judgment should be denied. MCR 2.116(I).

I acknowledge that in the only case found on point in which the plaintiff had no confirmation of the diagnosis that her mother had taken DES, the majority upheld the granting of summary judgment. See *O'Brien v Eli Lilly & Co,* 668 F2d 704 (CA 3, 1981). In my view, the better approach is that pointed out by Judge Higginbotham in dissent in *O'Brien:*

A reasonable jury could have concluded that, in insisting in 1979 that her mother double-check her recollection [that she had not taken DES], [the plaintiff] made extraordinary efforts; that, in fact, she discovered that her mother had taken DES only through the exercise of due diligence. The majority's conclusion effectively penalizes her, at least in terms of her right to a trial, for the efforts she made in 1979. [*Id.* at 719.]

MALLETT, J. (*dissenting*). Although I concur with the majority's analysis, I dissent from the majority's holding that Judith Harrington's suit is barred by the statute of limitations. The majority holds that in a pharmaceutical products liability action, the statute of limitations commences when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered the injury and the causal connection between plaintiff's injury and defendant's breach. Applying this standard, the majority concludes that Jean Moll knew or should have known of her possible cause of action no later than August 1976. Since evidence of her condition and the possible cause thereof was overwhelming, I agree that Jean Moll's suit is barred by the statute of limitations.

However, I dissent from the majority's conclusion that Judith Harrington knew or should have known of her injury on December 27, 1983. On December 27, 1983, Dr. Stern informed her that a possible cause of her inability to conceive was her bicornuate uterus, that may have been caused by exposure to DES. In early 1984, only a few weeks after Dr. Stern's diagnosis, Judith Harrington became pregnant. As a result, she achieved that which her injury was to ultimately prevent. Her injury did not manifest itself until April 1984, when she miscarried. Therefore, because the conse-

quences of her injury did not manifest itself until April 1984, the statute of limitations did not preclude her suit until April 1987.

The majority's unforgiving application of the discovery rule ignores the objective reality of Judith Harrington's circumstances. The record does not contain Dr. Stern's exact statements to her. Without this imperative information, it is impossible to confidently determine what she knew or should have known. If Dr. Stern unequivocally informed her that because of her exposure to DES she could never carry a child to term, I could concur with the majority's conclusion that the statute of limitations was triggered on December 27, 1983. However, without the record indicating otherwise, I assume that Dr. Stern's message was typically ambiguous and qualified. Consequently, her suit is not barred by the statute of limitations.

LEVIN, J. (*dissenting*). These cases, consolidated on appeal, concern the application of the discovery doctrine to causes of action claiming injury as a result of DES[1] exposure.

In *Moll v Abbott Laboratories,* the Court of Appeals affirmed a denial of the defendants' motion for summary judgment on the ground that the statute of limitations did not begin to run until Moll learned that she likely had a cause of action. I would vacate that decision and remand for trial on the issue whether Moll acted with reasonable

[1] Between 1947 and 1971 several million daughters were born to women who took DES during their pregnancies to prevent miscarriage. Subsequent research linked DES to cancerous and precancerous vaginal tract abnormalities, as well as problems related to pregnancy, in those prenatally DES-exposed daughters. Any woman exposed to DES in utero may, in varying degree, experience some, or all, or none, of these anomalies. *Market share liability: An answer to the DES causation problem,* 94 Harv L R 668 (1981).

diligence in discovering that DES exposure was a cause of her hooded cervix and infertility.

In *Harrington v Abbott Laboratories,* the Court of Appeals affirmed the circuit court's grant of summary disposition in favor of Abbott Laboratories on the ground that the statute of limitations began to run when Harrington learned of an abnormality of her uterus. I would vacate the decision of the Court of Appeals and remand for trial on the issue whether Harrington should have discovered that she was injured by DES exposure before she learned of her infertility.

I

Jean Moll has an "incompetent cervix," and for that reason is unable to carry a pregnancy to term. Because her cervix appeared irregular, her gynecologist, in 1975, asked her if she had had an abortion. She had not, and the gynecologist said that she had nothing to worry about regarding her cervix. Another gynecologist, in 1977, told her that she had a "hood over [her] cervix," asked her if her mother had taken DES while she was pregnant with Moll, and asked that she obtain her mother's medical records. That physician also told her that her cervix "didn't look good," that the condition *might* be related to exposure to DES, and that her difficulty conceiving *might* be related to DES. The physician added that DES exposure could lead to some forms of cancer. The physician also advised her to have a fertility test. Moll did not have the test at that time because she was "too chicken" and preferred to continue attempting to conceive.

By 1985, Moll, not having become pregnant, had the fertility test. After the test, her physician identified the hooded cervix as the probable cause of her inability to conceive.

This action was commenced on December 30, 1986, seeking damages for injuries from in utero exposure to DES. Abbott Laboratories filed a motion for summary disposition, asserting that Moll's mother had not ingested DES. The motion was granted, but entry of the order was stayed until Moll could complete her search for her mother's medical records.

In October, 1988, Moll obtained medical records establishing that her mother had taken DES. Abbott Laboratories then moved for summary disposition, asserting that Moll's claim was barred because more than three years had elapsed since she knew or should have known that her injuries may have been caused by in utero exposure to DES.

The circuit judge denied the motion. The Court of Appeals affirmed, but remanded for a finding when a reasonable person in Moll's circumstances would have concluded that her mother's ingestion of DES was a likely cause of her hooded cervix.

### A

The issue is whether Moll exercised reasonable diligence in discovering that DES exposure had caused her cervical condition and inability to conceive.[2] I agree with my dissenting colleague[3] that in assessing the reasonableness of Moll's delay in commencing this action, one should consider a number of factors including whether Moll sought to learn whether her mother had ingested DES, had

---

[2] I agree with my dissenting colleague that the majority needlessly opens an area of possible confusion in focusing on the asserted difference between "possible cause of action" and "likely cause of action." The majority acknowledges that other courts—including the Supreme Judicial Court of Massachusetts, in a decision cited by the majority as support for the " 'possible cause of action' standard"— have had difficulty distinguishing between the two standards. See ante at 25, n 29.

[3] Ante at 35.

informed herself through medical advice or lay literature of the potential connection between DES and reproductive problems, or sought to verify that DES, rather than another element, was a cause of her inability to conceive.[4]

In the DES context, the concept of reasonable diligence should take into account that when a reasonable woman learns that she may be afflicted with a serious reproductive disorder, she may initially take steps to address her medical problem in light of the available medical information and the course of treatment prescribed by her physician. Such a reasonable woman may reasonably continue to focus on the healing or diagnostic process until she has reasonable confidence that her condition has been correctly diagnosed or is under control. Reasonable diligence should include as a factor that a woman anxious to have children may, although advised that she may be a victim of defective drugs, be more concerned about her health and achieving conception than abandoning those efforts in favor of recourse to the courts.[5]

B

The record on appeal is sparse. We are therefore not in a good position to evaluate comprehensively the reasonableness of Moll's behavior in delaying the commencement of this action.[6] We do not have

[4] See *Renfroe v Eli Lilly & Co,* 541 F Supp 805 (ED Mo, 1982); *Raymond v Eli Lilly & Co,* 412 F Supp 1392 (D NH, 1976), aff'd 556 F2d 628 (CA 1, 1977).

[5] The majority's approach requires that a woman who might possibly have a claim commence an action although there has not been a *definitive* diagnosis. That approach might give rise to litigation that may appear to be groundless although, in the fullness of time, after entry of summary disposition and possible assessment of costs against her, it may appear that the woman had a meritorious cause of action.

[6] Each of the parties has included only the portions of the depositions that they rely on.

the full depositions either of Moll or her mother. The small bit of evidence that the parties have chosen to include in the record is sufficient, however, to lead me to conclude that the issue of Moll's diligence should not have been decided summarily.

Moll's testimony shows a woman confused about her condition, unable to obtain her mother's medical records, and fearful of a fertility test. Moll was receiving mixed signals from her physicians, who appear to have sought to alert her to the possibility of DES exposure without unduly frightening her. For instance, as the majority notes, in 1978 Moll was informed that the results of her colposcopy "were . . . fine" and also that "there was no cause for real concern at that time," but also that her cervical condition could indicate DES exposure which could lead to cancer.

After receiving these *mixed* signals about her health and the warnings about *possible* DES exposure, Moll *did* make an attempt to locate her mother's medical records in 1979. Her mother's records had been stored at the Highland Park General Hospital, which had since closed because of fire, and Moll was unable to obtain the records. Moll's physician then made an unsuccessful attempt to locate the missing records. That, too, failed. Moll decided to focus her energies on conceiving a child to determine if the DES exposure had truly left her unable to bear children. She did not pursue the medical records again until after this action was commenced. Even then, Moll was able to find and obtain the records only pursuant to a court order. The records finally confirmed that Moll's mother had been treated with DES during Moll's gestation.

C

The majority concludes, as a matter of law, that

Moll did not exercise due diligence in attempting to discover the cause of her medical problems. However, before 1985, Moll's physicians were only able to speculate about a possible link between her health problems and her mother's ingestion of DES. No doctor told her with a fair degree of certainty that her condition was caused by DES.[7]

The consultations with her physicians concerning her possible DES exposure came while Moll was undergoing examination and treatment for ailments such as excess vaginal discharge and infertility. The trier of fact could reasonably conclude that during this period Moll was reasonably justified in focusing on solving her medical problems rather than immediately searching to discover whether DES was a cause of those problems.

In all events she made a good-faith attempt to discover whether DES was a cause, without success. Moll and her physician each made attempts to find her records in the late 1970's, but failed to do so. A reasonable trier of fact could conclude that due diligence required no more.

### D

In holding that the statute of limitations begins to run as soon as a woman, situated as was Moll,

---

[7] In a similar case, the court rejected Lilly's claims that where the plaintiff's doctors had speculated about a potential link between the plaintiff's health problems and DES exposure, she had sufficient notice of a cause of action to commence the running of the statute of limitations. *Renfroe v Eli Lilly & Co,* n 4, *supra.* Renfroe's doctor testified that he discussed with her "the possible association of her cervical cancer with her mother's ingestion of Stilbestrol or DES during her pregnancy . . . ." *Id.* at 811. The court refused to grant summary disposition on the basis of the doctor's statements because it was not "absolutely clear that plaintiff was sufficiently apprised of a definite link between her DES exposure and her cancer" by those statements. *Id.*

discovers a "possible cause of action," the majority places all such women in an untenable dilemma. If Moll had commenced an action when she was able to allege only a "possible" link between DES exposure and her injury, she very well may have suffered summary disposition. The majority's approach thus effectively may deprive women like Moll of a meaningful opportunity to commence an action and recover for their injuries.

The Ohio Supreme Court recently struck down a DES-specific statute of limitations—which mirrored the Court's approach in this case—because the statute did not afford DES-exposed women a reasonable opportunity to bring a claim for their injuries. *Burgess v Eli Lilly & Co,* 66 Ohio St 3d 59; 609 NE2d 140 (1993). The statute at issue in *Burgess* provided that a cause of action for DES-related injuries accrues "upon the date on which the plaintiff learns from a licensed physician that he has an injury which may be related to such exposure, or upon the date on which by the exercise of reasonable diligence he should have become aware that he has an injury which may be related to such exposure . . . ." *Id.* at 61. In the Ohio court's words, the statute of limitations "is triggered when the plaintiff learns that she *possibly* has a DES-related injury." *Id.*

In a well-reasoned opinion, the court explained why the statute was unreasonable:

> If a plaintiff were to file a complaint stating that she suffered a bodily injury which *might* be related to DES, the complaint would be dismissed for failure to state a claim. . . . Because the statute of limitations begins running when there is the slightest evidence that DES may be a possible cause of plaintiff's symptoms, an attorney may be forced to file a complaint long before he can believe that

there is good ground to support it. The alternative is to file no complaint. A plaintiff encounters further difficulties at the summary judgment level. A claim . . . must be filed based upon the possibility of an injury. A plaintiff faces the likely prospect that her claim will be unable to survive a motion for summary judgment. [*Id.* at 62.]

The "possible" claim approach was seen as unreasonable[8] by the Ohio Supreme Court because it deprived plaintiffs of "an opportunity for remedy at a meaningful time or in a meaningful manner." *Id.* at 63. The majority's approach deprives women of remedies for DES-related harms in much the same way as the Ohio statute in *Burgess.*

II

Judith Harrington was exposed to DES in utero. She became aware of her DES exposure in January, 1975, and, between 1975 and 1983, saw several physicians who informed her that she exhibited certain abnormalities associated with DES exposure, including having a mosaic on her cervix. In 1983, because she was having difficulty becoming pregnant, she had an HSG test—an x-ray of the uterus and fallopian tubes. On December 27, 1983, her physician informed her of the results of the test—that she had a bicornuate uterus, and that it *might* also be abnormally T-shaped, which *could* cause difficulty in conceiving or carrying a preg-

---

[8] The Ohio court struck down the statute because it violated the Ohio Constitution's guarantee of a remedy for every injury. The Ohio court had previously construed its constitution as requiring a meaningful remedy. While *Burgess* technically involved the application of a unique provision of Ohio constitutional law, it more fundamentally involves a determination by the Ohio court that a rule of law commencing the running of the statute of limitations on a DES-related claim when a plaintiff has only limited and speculative knowledge concerning the nature of her possible claim unfairly deprives many DES-exposed women of a meaningful remedy for their injuries.

nancy to term—and he scheduled additional tests, including a D and C.[9]

During that office visit the physician told Harrington, however, that while some DES exposed daughters have difficulty conceiving and carrying a pregnancy to term, he was *optimistic* it would not be the case with her.[10]

Harrington became pregnant in January or February, 1984, and miscarried in March 1984. Her physician then performed a D and C and informed her that after a better look at her uterus, he found that it was too small to permit her to carry a pregnancy to term. The physician advised her not to become pregnant again.

Harrington filed this action on December 30, 1986.

The circuit judge granted Abbott Laboratories' motion for summary disposition on the basis that, pursuant to the discovery rule set forth in *Larson v Johns-Manville Sales Corp*, 427 Mich 301, 309; 399 NW2d 1 (1986), the three year statute of limitations began to run on December 27, 1983—when Harrington learned of the result of the HSG test and knew that she had suffered "some damage" in the form of a misshapen uterus. The Court of Appeals affirmed.

A

The issue is when Harrington "knew" or "should have known" that she was "injured." *Lar-*

---

[9] The other tests were a hysteroscopy, a laparoscopy, and a hydroperfusion of her tubes, all of which were done—with inconclusive results—in early January, 1984.

[10] The record describes the miscarriage as occurring in March, 1984, *and* in April, 1984.

*son, supra* at 309. I would hold that considering the unique nature of DES-related harms, a reasonable trier of fact could conclude that Harrington should not have known that she was injured before she learned of her infertility.

Exposure to DES can have multiple effects—some of which will develop into compensable injuries—including cancer, uterine abnormalities, and difficulty with conception and then carrying a pregnancy to term. Not all the effects caused by DES exposure are in fact "harms" or "injuries" at the instant that the DES effect is discovered.

Harrington's physician told her that DES exposure might have caused the development of her abnormal uterine condition. He also told her that this condition *could* cause difficulty in conceiving and carrying a child to term, but he was *optimistic* that would *not* be the case with her.[11] At the same time, her physician advised her that many DES-exposed daughters do not have difficulty bearing children. The trier of fact could reasonably conclude that when Harrington first learned of her uterine condition it was not causing her any harm, and that she was reasonably justified in not considering it to be a present injury.

The Court errs in defining Harrington's initial uterine condition as her injury and in defining the infertility as mere "additional consequences" of her "physical abnormality." *Ante* at 20. Harrington's physical abnormality was *not,* in itself, clearly an injury that would cause her any sort of distress. Only after Harrington discovered that the physical abnormality would indeed prevent her

---

[11] The majority errs in stating that "[t]he full extent of Judith Harrington's injury and subsequent damage related to her physical abnormality (i.e., her infertility) was fully detectable at the time of initial discovery of her injury [i.e., her uterine condition]." *Ante* at 19.

from conceiving and carrying a child to term did she know that she had been truly harmed.[12]

The majority's approach places plaintiffs like Harrington in an untenable position in much the same way as the majority placed plaintiffs like Moll in an untenable position. The majority would have had Harrington file her action before she learned whether the uterine condition would truly be a problem. If she would have filed an action when she first learned of her uterine condition, before she knew whether the condition would cause infertility or other health problems, her action would probably have been dismissed on a motion for summary disposition. At that juncture, Harrington would not have been able to show how she had been harmed by DES. Her own physicians were telling her that they were optimistic that she could have children even with the uterine condition. Harrington would not have been able to identify any harm she was then suffering from the DES exposure, nor could she have carried the burden of showing that it was reasonably certain that her DES-related condition would eventually develop into a compensable injury. See *Larson.*[13] A reason-

[12] See *Harper v Eli Lilly & Co,* 575 F Supp 1359, 1362 (ND Ohio, 1983). In that DES case, the court noted that "many courts, when faced with the task of identifying a specific date of manifestation of injury, have adopted dates more closely identified with discovery of *significant* injury or causation." (Emphasis added.)

[13] Treating Harrington's infertility rather than her uterine condition as the relevant injury (the discovery of which triggered the discovery rule) is fully consistent with this Court's recent discovery rule decision in *Larson, supra* at 304-305: a plaintiff in an asbestos-based harm case who develops cancer may commence an action within three years of when the cancer was or should have been discovered, notwithstanding that he may have developed asbestosis long before the three-year limitation period. The Court observed that the plaintiffs in the asbestos cases "were exposed to asbestos long before they suffered any measurable [cancer-related] harm from the exposure," *id.* at 311, and nevertheless held that the statute of limitations did not begin to run with respect to their cancer claims until the plaintiffs suffered *measurable,* cancer-related harm.

able trier of fact could conclude that Harrington acted with reasonable diligence in waiting until 1986 to conclude that she had suffered an injury.

### III

The majority also errs in holding that a circuit judge should decide, on a motion for summary judgment, whether Moll and Harrington exercised due diligence in discovering the nature and extent of their injuries. The majority states that a circuit judge "does not have to remain idle in the presence of undisputed, uncontroverted facts" where "the only question remaining is what legal conclusion can be drawn from the facts." *Ante* at 27-28.

It is well settled as a matter of both Michigan and federal civil procedure that it is for the trier of fact, generally the jury, to decide where reasonable persons can draw different inferences from undisputed facts. In *DiFranco v Pickard,* 427 Mich 32, 54; 398 NW2d 896 (1986), this Court said, "where there is no material factual dispute, a motion for summary disposition (as well as directed verdict and judgment notwithstanding the verdict) should not be granted if the facts can support conflicting inferences." See also *Windsor Securities, Inc v Hartford Life Ins Co,* 986 F2d 655,

---

In this case, the injury was not measurable—did not truly exist—until Harrington discovered her infertility. Thus, under the *Larson* rationale, the statute of limitations on Harrington's claim did not begin to run until then.

The majority narrowly construes *Larson* as being "premised . . . on the independence" of the two different harms: asbestosis and cancer. *Ante* at 19. The Court then distinguishes this case from *Larson* on the basis of the assertion that Harrington's infertility is not distinct from her uterine condition. The majority overlooks that the independence of the harms in *Larson* was important precisely because it demonstrated that when the first harm appeared, the second harm was not measurable (i.e., asbestosis was not a clear precursor to cancer). Similarly, in this case, when the uterine condition appeared, there was literally no measurable harm.

659 (CA 3, 1993) ("Summary judgment may not be granted, however, where there is disagreement over the inferences that can be reasonably drawn from the facts even if the facts are undisputed"); *Webb v Allstate Life Ins Co,* 536 F2d 336, 339 (CA 10, 1976) ("Where different ultimate inferences may properly be drawn, the case is not one for summary judgment").

The undisputed facts in both *Moll* and *Harrington* are subject to conflicting inferences. Reasonable minds could differ concerning when Harrington knew or should have known that she sustained a compensable injury: was the key event the discovery of the misshaped uterus or the discovery that the consequence of that uterine condition would be infertility? Reasonable minds could also differ whether Moll acted with due diligence in pursuing the DES exposure issue. The answers to the questions posed by these factual situations are far from clear. Thus, judgment as a matter of law is appropriate in neither, and both Moll and Harrington are entitled to a determination by the constitutionally ordained trier of fact, a jury.

In a closely related discovery case, also involving a claim for DES-caused injuries and in which there was "no dispute between the parties as to the essential evidentiary facts, but only as to the ultimate conclusion to be drawn from those facts," the United States District Court for the District of Massachusetts held that the resolution of the question "whether, under all the circumstances, [the plaintiff] reasonably should have discovered the cause prior to" the running of the statute of limitations *"requires a determination of the reasonableness of plaintiff's conduct,"* and therefore did "not lend itself to determination as a matter of

law." *Errichiello v Eli Lilly & Co,* 618 F Supp 484,
487 (D Mass, 1985) (emphasis added).[14]

## IV

Neither of the primary justifications for apply-
ing the statute of limitations—the barring of stale
claims and providing the defendant reasonable
notice of potential claims—is served by closing the
courthouse door to Moll and Harrington and their
DES sisters.

As the Rhode Island Supreme Court observed,
allowing plaintiffs such as Moll and Harrington to
bring DES claims long after their mothers ingested
the drug does not unfairly " 'force an unfresh
claim against a party who is left to shield himself
from liability with nothing more than tattered or
faded memories, misplaced or discarded records,
and missing or deceased witnesses.' " *Anthony v
Abbott Laboratories,* 490 A2d 43, 47 (RI, 1985).
Rather, in DES cases:

"Most of the evidence necessary to prove or
_____

[14] See also *Raymond v Eli Lilly & Co,* n 4, *supra* at 1401. The court
first noted that the issue of a plaintiff's due diligence is usually a
"determination of fact left . . . for the jury . . . ." Lilly argued that
the plaintiff should have known of the link between its product and
her vision problem on the basis of some fairly vague and contradic-
tory remarks by her ophthalmologist and her other doctors. In partic-
ular, the ophthalmologist told the plaintiff that he was taking her off
the birth control pill "just as a precautionary measure," and other
doctors told the plaintiff that they were not sure whether Lilly's
product had caused the plaintiff's eye condition. The Court concluded
that these statements by the plaintiff's doctors were "insufficient to
warn plaintiff that there was a correlation between the drug and her
vision problems." *Id.*

Similarly, in Harrington's case, the mixed messages she received
from her doctors about the extent and consequences of her uterine
condition were insufficient to put her on notice of her injury so as to
preclude her claim as a matter of law. And, in Moll's case, her
physician's suggestion that she should check her mother's records
because DES was a possible cause of her condition was not sufficient to
provide Moll notice of her possible claim against the drug manufac-
turers so as to preclude her claim as a matter of law.

defend against liability is likely to be documentary in nature. It is not the kind of evidence that is lost or becomes unreliable as time passes. Companies generally compile and maintain research records that document the extent of their knowledge of the harmful propensities of their drugs. Certainly, doctors and hospitals meticulously maintain and store records of patient treatments." [*Id.* Citations omitted.]

See also *Raymond v Eli Lilly & Co,* 117 NH 164, 174; 371 A2d 170 (1977) (noting that extending the statute of limitations against drug companies is equitable, inter alia, because "unlike the situation in most cases, the passage of time in a drug case is likely to increase both the amount and the accuracy of the evidence"). Indeed, "because this product [DES] usually affects a different generation from that which received the product, plaintiffs and not defendants would be most prejudiced by faded memories, misplaced records, or deceased witnesses." *Anthony,* 490 A2d 47. Thus, the claims in the instant cases are hardly "stale," and the passage of time has not deprived the pharmaceutical companies of relevant evidence that would support a defense.

Allowing Moll and Harrington to proceed would not force the pharmaceutical companies to defend against wholly unexpected claims. Indeed, since well before the landmark case of *Sindell v Abbott Laboratories,* 26 Cal 3d 588; 163 Cal Rptr 132; 607 P2d 924 (1980) (approving the market-share basis of liability for DES manufacturers), the pharmaceutical companies who manufactured DES have had actual notice that potentially thousands of so-called "DES daughters" would have possible causes of action.

The hundreds of reported DES cases against these

pharmaceutical companies suggest that in all likelihood they have legal counsel well experienced in litigating DES suits. Against this dense background of DES litigation, the majority's concern about " 'put[ting Lilly and Abbott] on notice' " that they may face additional DES claims rings hollow. *Ante* at 23, n 27.

I would remand the cases for trial.